**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---

|  |  |  |
|---|---|---|
| | : | Chapter 7 |
| In re: | : | |
| | : | Case No. 07-11079 (KJC) |
| HOMEBANC MORTGAGE | : | |
| CORPORATION, *et al.*, | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |

---

|  |  |  |
|---|---|---|
| | : | |
| WELLS FARGO BANK, N.A., in its | : | Adv. Proc. No. 07-51740 (KJC) |
| capacity as Securities Administrator, | : | (Re: D.I. 231, 235, 276) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HOMEBANC CORP., BEAR, STEARNS & | : | |
| CO. INC., BEAR, STEARNS | : | |
| INTERNATIONAL LIMITED, AND | : | |
| STRATEGIC MORTGAGE OPPORTUNITIES | : | |
| REIT INC., | : | |
| Defendants. | : | |
| | : | |

---

## OPINION[1]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

## I.  BACKGROUND

On August 9, 2007 (the "Petition Date"), HomeBanc Mortgage Corporation and related

entities (the "Debtors") filed voluntary chapter 11 bankruptcy petitions.[2]  By Order dated

---

[1]The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(B), (C), (E) and (F).  If any court determines that a final order or judgment in this matter by this Court is not consistent with Article III of the United States Constitution, then this Opinion and Order are submitted as proposed findings of fact and conclusions of law in accordance with the District Court's Amended Standing Order of Reference dated February 29, 2012.

[2]The related entities that filed chapter 11 petitions are: HomeBanc Mortgage Corporation, HomeBanc Corp., HomeBanc Funding Corp. II, HMB Acceptance Corp., HMB Mortgage Partners, LLC, and HomeBanc Funding Corp.

February 24, 2009, the cases were converted to a chapter 7 liquidation.[3]  George Miller was

appointed as the Debtors' chapter 7 trustee on February 25, 2009 (the "Trustee," and together

with the Debtors, "HomeBanc").[4]

On October 25, 2007, Wells Fargo Bank ("Wells Fargo") commenced this adversary

proceeding by filing an interpleader complaint (the "Interpleader") against three parties: (i)

HomeBanc Corp., (ii) Bear, Stearns & Co. Inc. ("BSC"), and (iii) Bear, Stearns International

Limited ("BSIL").[5]  Wells Fargo was securities administrator, paying agent, note registrar, and

certificate registrar (collectively, "Securities Administrator") for certain mortgage-backed

certificates (the "Mortgage Certificates") held by the Bear Defendants.  As Securities

Administrator for the Mortgage Certificates, Wells Fargo held $759,832.62 in principal and

interest for the month of August 2007, which became payable on September 25, 2007 (the

"August Payment").  The Bear Defendants and HomeBanc asserted competing claims to the

August Payment, which led Wells Fargo to file the Interpleader.  The Bear Defendants and

Homebanc also asserted cross-claims against each other.[6]  Pursuant to an Order dated June 2,

---

[3]D.I. # 1348.  Items on the docket of the main bankruptcy case, Case No. 07-11079, are referred
to as "D.I. # __" and items from the docket for the adversary proceeding, Adv. Proc. No. 07-51740, are
referred to as "A.D.I. # __."

[4]D.I. # 1350.

[5]Wells Fargo amended the Interpleader Complaint on or about November 19, 2007, adding
Strategic Mortgage Opportunities REIT, Inc. ("SMOREIT") as a defendant.  BCS, BSIL and SMOREIT,
together, are referred to herein as the "Bear Defendants").

[6]On December 7, 2007, the HomeBanc filed an answer to the Interpleader Complaint which
included affirmative defenses and cross-claims against the Bear Defendants (A.D.I. # 16).  HomeBanc's
cross-claims were stated in seven counts: Count I: Breach of Contract, Count II: Conversion, Count III:
Turnover of Property of the Estate, Count IV: Violation of the Automatic Stay, Count V: Unjust
Enrichment, Count VI: Avoidance and Recovery of a Preference, and Count VII: Accounting.
        On the same date, the Bear Defendants also filed an answer to the Interpleader Complaint, which
included affirmative defenses and two cross-claims against HomeBanc: Count I: Breach of the

2011, Wells Fargo's interpleader request was granted and Wells Fargo deposited the August Payment[7] with this Court and was subsequently dismissed from these proceedings as of June 8, 2011.[8]   The cross-claims between HomeBanc and the Bear Defendants remain.

On December 7, 2010, the Trustee and the Bear Defendants filed cross-motions for summary judgment.[9]   The Bear Defendants' motion for summary judgment seeks determinations in their favor with respect to the August Payment issue, their own cross-claims, and HomeBanc's cross-claims.   HomeBanc's motion for partial summary judgment seeks judgment in its favor on its cross-claims for conversion (Count II), turnover of property of the estate (Count III), and violation of the automatic stay (Count IV).

This litigation arises out of the prelude to the financial crisis, which was neither widely recognized nor reached its nadir until later, and relates to private label mortgage-backed securities-based repurchase agreements between the Bear Defendants and HomeBanc. HomeBanc failed to pay the Bear Defendants repurchase prices in August 2007.   Thereafter, the Bear Defendants withheld and liquidated certain securities, relying on the safe harbor of Bankruptcy Code § 559  to liquidate those securities by auction without first seeking Bankruptcy Court approval.

The parties focused their attention on three issues in their papers and at oral argument. Today, I decide only those three legal issues.

---

Repurchase Agreement, and Count II: Unjust Enrichment.  (A.D.I. 15).

[7]The exact sum deposited with the Bankruptcy Court was $793,918.41.  This included interest earned since the filing of this adversary proceeding, less the Wells Fargo Fees.  *See* A.D.I. # 271-273.

[8]A.D.I. #271 and A.D.I. #273.

[9]HomeBanc, A.D.I. # 231; the Bear Defendants, A.D.I. # 235.

The first issue is whether certain transactions under the parties' contract for the sale and repurchase of mortgage-backed securities fall within the definition of a "repurchase agreement" (also known as a "repo") as set forth in § 101(47) of the Bankruptcy Code. If the transactions are "repurchase agreements," then they enjoy certain protections under the safe harbor of § 559 of the Bankruptcy Code. For the reasons stated below, I conclude that the transactions between HomeBanc and the Bear Defendants related to ten securities (the "Securities at Issue") are repurchase agreements under § 101(47).[10] Therefore, the Bear Defendants' exercise of their contractual rights with respect to the Securities at Issue fell within the safe harbor of § 559.

The second issue is whether the August Payment should be paid to the Bear Defendants, as owners of certain Interpleader Securities, or HomeBanc, as the registered certificateholder of the Interpleader Securities on the record date.[11] Under the plain language of the controlling contracts, as well as previous decisions in this Circuit on this issue, the monthly principal and interest payments should be made to the registered certificateholder of the Interpleader Securities as of the record date, i.e., HomeBanc. Therefore, HomeBanc is entitled to the August Payment.

The final issue relates to the Bear Defendants' post-default auction to liquidate the Securities at Issue. HomeBanc alleges that the Bear Defendants breached the terms of the repurchase agreements and wrongfully converted HomeBanc's property by selling the Securities at Issue to themselves via an auction that was not conducted in good faith or in a commercially reasonable manner. Because Article 9 of the Uniform Commercial Code is inapplicable to

---

[10]The Securities at Issue are: HMBT 2004-1R, HMBT 2004-2R, HMBT 2005-1R, HMBT 2005-2R, HMBT 2005-3R, HMBT 2005-4B2, HMBT 2005-4R, HMBT 2006-2R, HMBT 2007-1I-3x, and HMBT 2007-1R. Bear Appx. Ex. 21.

[11]Copies of the "Interpleader Securities" are attached to the HomeBanc Appx. (A.D.I. #233) Exs. 74 - 81.

repurchase agreements, the "commercially reasonable" standard does not apply to the auction. Instead, the applicable repurchase agreement allowed the Bear Defendants to use their discretion in valuing the securities post-default, so long as the Bear Defendants acted rationally, and their sale of the securities by auction was not irrational or in bad faith. I conclude that, under these circumstances, the auction should not be upset.

Accordingly, for the reasons set forth herein, partial summary judgment will be granted in favor of HomeBanc on the claim for turnover of the August Payment, and partial summary judgment will be granted in favor of the Bear Defendants on the claim for violation of the automatic stay and the claim for breach of contract as it relates to the auction of nine of the ten Securities at Issue.[12]

## II.  UNDISPUTED FACTS

HomeBanc and the Bear Defendants entered into two sophisticated "master repurchase agreements" in 2005.[13]  First, on September 19, 2005, BSC and HomeBanc, entered into the Master Repurchase Agreement (the "MRA").[14]  Later, on October 4, 2005, BSIL and HomeBanc entered into the Global Master Repurchase Agreement (the "GMRA").[15]  The MRA and GMRA governed HomeBanc's and the Bear Defendants' relationship at the macro level.

Pursuant to the MRA and GMRA, specific transactions between HomeBanc and the Bear

---

[12]*See* n. 73, *infra.*

[13]*See generally Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.),* 379 B.R. 503, 511-515 (Bankr.D.Del. 2008) (describing repurchase agreements).

[14]Appx. to the Bear Defendants' Brief In Support of the Motion for Summary Judgment (A.D.I. # 237) (the "Bear Appx."), Ex. 1.

[15]Bear Appx., Ex. 2.

Defendants were confirmed on the micro level with written "confirmations," which are, essentially, receipts identifying, among other things, the purchase date, the purchase price, the repurchase date, and the pricing rate (i.e., the differential between the purchase price and the repurchase price) for each purchased security (a "Confirmation").[16]  Between 2005 and 2007, HomeBanc obtained significant financing (approximately $200 million) from the Bear Defendants through numerous repurchase transactions.  These transactions were evidenced by Confirmations.

In August 2007, HomeBanc was unable to meet certain obligations under its repurchase agreements with the Bear Defendants. On August 8, 2007, BSC and BSIL sent notices to HomeBanc, advising that the term repurchase agreements would not be "rolled" or extended, declaring all amounts due and, without waiving any rights, agreeing to accept full payment by close of business on August 9, 2007.  After HomeBanc failed to pay the amounts due under the repurchase agreements on August 9, 2007, the Bear Defendants sent HomeBanc notices of default.

After noticing HomeBanc of its default, the Bear Defendants asserted that they had the contractual right to liquidate the securities in their possession by auction, and to offset the auction proceeds against HomeBanc's unpaid repurchase amounts.  HomeBanc filed for bankruptcy protection on August 9, 2007.  On August 10, 2007, the Bear Defendants solicited bids, due on August 14, 2007 by 3:00 p.m., for certain HomeBanc securities (the "Auction").[17]

---

[16] Bear Appx. Ex. 1 (MRA § 3), Ex. 2 (GMRA § 3).  The parties agreed that a repurchase transaction setting the repurchase date as "open" (also called an "open repo") means that transaction is "terminable on demand" by either party.  Bear Appx. Ex. 19.

[17] Bear Appx. Exs. 141, 142, 143 and 144.  One security was removed from the August 14, 2007 Auction and auctioned separately on August 17, 2007. Connell Aff. (A.D.I. #240) ¶41.

**Securities at Issue**

This litigation involves ten Securities at Issue, arising from three related sets of

transactions, described below.[18]

The June 2006 Transactions

The first set of transactions was completed on June 23, 2006 (the "June 2006

Transactions").  On that date, BSIL provided $11 million to HomeBanc in exchange for a group

of 11 securities, including three Securities at Issue.[19]  The Bear Defendants' employee, Edward

Neibert, described the transaction to HomeBanc's employee, Yancy Lockie, in an email dated

June 23, 2006, stating:

> **Bear Stearns is lending 11mm dollars versus all of the above collateral** [*i.e.,* a
> list of 11 securities described in the collateral sheets attached to the email].  Three
> of the securities are vs money (7/26/2006) and the balance of securities are held
> as free collateral **(on open)**.  Please feel free to call me if you have any questions.
> Thanks."[20]

"On open" is considered a term of art in the repurchase agreement market, generally known to

mean "payable on demand."[21]

The Bear Defendants sent Confirmations, dated June 13, 2006, to document each security

---

[18]*See* n. 10, *supra.*, for a list of the Securities at Issue.

[19]Bear Appx. Ex. 56 at A1140, A1141, A1144 (HMBT 2005-4B2; HMBT 2005-3R; HMBT 2005-4R).

[20]Bear Appx. Ex. 56 at A1133 (emphasis added).  Lockie testified that he was responsible for record keeping regarding HomeBanc's repurchase agreement operations. Bear Appx. Ex. 4 (Lockie Tr. 65:3 - 65:11). After reading Neibert's email and the attached collateral sheets, Lockie asked for additional information, but neither questioned nor objected to Neibert's characterization of the transaction. Bear Appx. Ex. 60, Ex. 4 (Lockie Tr. 253:12 -255:18).

[21]Bear Appx. Ex. 19.

sold by HomeBanc to BSIL as part of the June 2006 Transactions.[22]  The Confirmations for three

of the securities showed purchase prices of $4 million, $4 million and $3 million, respectively.

The Confirmations for the remaining eight securities showed a purchase price of zero and open

repurchase dates.[23]  Included in the group showing the zero purchase price were three of the

Securities at Issue (HMBT 2005-4B2, HMBT 2005-3R, and HMBT 2005-4R).[24]

The June 2007 Transactions

HomeBanc sought additional capital in June 2007.  The Bear Defendants advanced $10

million to HomeBanc.[25]  The parties initially negotiated an exchange of seven securities for the

$10 million advance,[26] but five of the seven contemplated securities had been three-hole-

punched, rendering them void.[27]  Thus, the parties agreed Bear Stearns would advance $10

million to HomeBanc in exchange for two securities, which are now Securities at Issue (HMBT

2006-2R and HMBT 2007-1R) (the "June 2007 Transactions").[28]  The June 21, 2007 email from

Neibert to Lockie describing the June 2007 Transactions provides:

> Starting today, Homebanc entered into a new repurchase agreement with Bear
> Stearns in the amount of 10 million dollars.   Two securities were previously on
> repo for 4mm each.  In order to get the 10mm the borrowed amounts on these two
> securities increased.  What we have done was to end the previous repo and charge
> you repo interest to date (10,346.68 on each).  Total net proceeds wired to your ...

---

[22]Bear Appx. Ex. 3 at A51, A52, and A53.

[23]*See* Bear Appx. Ex. 56 (which contains similar information on the collateral sheets).

[24]Bear Appx. Ex. 3 at A51, A52, and A53.

[25]Bear Appx. Ex. 97, Ex. 98.

[26]Bear Appx. Ex. 92, Ex. 93, Ex. 95.

[27]*Id.*

[28]Bear Appx. Ex. 97.

account are 9,979,206.65.  All new repurchase agreements will end on 6/26/2007.[29]

Attached to the June 21, 2007 email were collateral sheets for the two securities.  Lockie testified in his deposition that, despite some initial confusion over the mechanics of the June 21, 2007 transaction, HomeBanc figured out Neibert's explanation.[30]   The Bear Defendants sent Confirmations dated June 21, 2007 to document the securities sold by HomeBanc to BSIL pursuant to the June 2007 Transactions, showing two Securities at Issue (HMBT 2006-2R and HMBT 2007-1R) with a zero purchase price and the repurchase date as "open."[31]

When HomeBanc's term repos matured a few days later on June 26, 2007, HomeBanc paid the Bear Defendants approximately $2.8 million to "roll" (extend) the term repos.[32]   Neibert sent Lockie an email dated June 26, 2007, stating, "Please find attached all collateral sheets and repo spreadsheet for Homebanc Corporation Repo Roll with Bear Stearns."[33]   The two Securities at Issue from the June 2007 Transactions were listed on the repo spreadsheet attached to Neibert's email as having a "repo start date" of June 21, 2007 and an "open" repurchase date.[34]

The July 2007 Transactions

 The five three-hole-punched securities certificates discussed as part of the June 2007 Transactions were replaced (without three-hole-punches) and delivered to the Bear Defendants,

---

[29]*Id.*

[30]Bear Appx. Ex. 4 (Lockie Tr. 359:20- 360:25).

[31]Bear Appx. Ex. 3 at A54, A55.

[32]Bear Appx. Ex. 99, Ex. 4 (Lockie Tr. 361:1 - 366:12).

[33]Bear Appx. Ex. 99.

[34]Bear Appx. Ex. 99 at A2150-A2153, Ex. 4 (Lockie Tr. 361:22 - 363:6).  A similar repo roll occurred on July 10, 2007.  Bear Appx. Ex. 100.

and, on July 18, 2007, Neibert sent an email to Lockie attaching "collateral sheets for the residuals received."[35]  The attached collateral sheets were for four of the Securities at Issue (HMBT 2004-1R, HMBT 2004-2R, HMBT 2005-1R and HMBT 2005-2R).[36]  The Bear Defendants sent Confirmations dated July 17, 2007 to document the sale of the securities from HomeBanc to BSIL, each showing a zero purchase price and the repurchase date as "open."[37]

When HomeBanc's term repos again matured on July 27, 2007, HomeBanc paid the Bear Defendants approximately $5.5 million to roll the repos to a new term ending only one week later, August 3, 2007.[38]  By email dated July 27, 2007, Neibert sent Lockie documentation for the roll, including a repo spreadsheet that listed all ten of the Securities at Issue.[39]

**HomeBanc Fails to Make Payments**

HomeBanc's term repos were set to mature on August 3, 2007.  As the date approached, HomeBanc requested that the Bear Defendants bid on a number of securities subject to repo transactions between the parties in an effort to sell those securities to the Bear Defendants on an outright basis (i.e., independent of any repurchase obligation).[40]  On August 3, 2007, the parties settled on the sale of securities, for which the Bear Defendants credited HomeBanc with

---

[35]Bear Appx. Ex. 104.

[36]*Id.*

[37]Bear Appx. Ex. 3 at A56, A57, A58 and A59.

[38]The term repos matured on July 26, 2007, but were extended one day to July 27, 2007 to permit the Bear Defendants time to re-price the securities.  Bear Appx. Ex. 106, Ex. 108.

[39]Bear Appx. Ex. 109 at A2309 - A2313; Security in Issue HMBT 2007-1I-3x is listed separately on A2296 with an "open" repo end date on A2299.

[40]Connell Aff. (A.D.I. # 240) ¶22. Bear Appx. Ex. 112, Ex. 113, Ex. 114, Ex. 115.

approximately $140 million (the "Sold Securities").[41]

The term repos' end date was extended to August 7, 2007, without the transfer of additional funds.[42]  Around that time, the mortgage-backed securities market was deteriorating.[43] The Bear Defendants agreed to roll certain term repo transactions that were due to be paid on August 7, 2007, if HomeBanc reduced its outstanding repo debt by making a payment of approximately $27 million.[44]  HomeBanc did not make the $27 million payment and, on August 8, 2007, the Bear Defendants sent HomeBanc a notice that those repo transactions were not "rolled, repriced or otherwise extended" and, therefore, were due and payable in full.[45]  The email notice further stated:

> Notwithstanding the foregoing, and without in any way waiving any of its rights or remedies under the MRA or the GMRA or otherwise, Bear, Stearns & Co. Inc. and Bear Stearns International Limited have at the present time decided to give HomeBanc Corp. until the close of business tomorrow, Thursday, August 9, 2007, to make all such payments in full to Bear, Stearns & Co. Inc. and Bear, Stearns

---

[41] Bear Appx. Ex. 21 at A916, Ex. 120.  The date of settlement for this sale is unclear, since the parties' briefs also assert that settlement of this sale was postponed to August 7, 2007.  For purposes of this Opinion, whether the sale date was August 3 or August 7, 2007 is immaterial.  The HomeBanc Trustee argues, however, that the Debtor was not paid in full for the Sold Securities and asserts a claim of $6.7 million with respect thereto.  However, this claim is not part of the Trustee's partial summary judgment motion.  HomeBanc Brief, A.D.I. 232, n. 13.

[42] Connell Aff. (A.D.I. # 240) ¶24.

[43] See, e.g.,  Bear Appx., Ex. 6 (Kubiak Tr. at 153:16- 154:8); Ex. 7 (Race Tr. at 70:23 - 72:6).

[44] Bear Appx., Ex. 129; Ex. 4 (Lockie Tr. 433:16 - 434:14).

[45] Bear Appx. Ex. 131; Ex. 4 (Lockie Tr. 437:17 - 438:18).  During the parties' negotiations on August 8, 2007, David Hinkleman of Bear Stearns forwarded an offer to HomeBanc's chief financial officer, John Kubiak, to structure a transaction pursuant to which Bear Stearns would purchase the securities for approximately $60.5 million.  The proposed transaction was not accepted by HomeBanc's board of directors.  Bear Appx. Ex. 135, Ex. 136, Ex. 6 (Kubiak Tr. 197:9 - 201:8), Ex. 11 (Hinkelman Tr. 172:13 - 176:10).

International Limited.[46]

Further, on the same date (August 8, 2007), the Bear Defendants sent Confirmations of

repurchase transactions showing HomeBanc's repurchase of certain Securities at Issue with a

zero purchase price (the "August 8 Confirmations").[47]

HomeBanc failed to pay the aggregate repurchase price (approximately $64 million) by

the close of business on August 9, 2007, and, at 7:07 p.m., the Bear Defendants issued formal

notices of default.[48]  Later that night, HomeBanc and its affiliates filed chapter 11 bankruptcy

petitions with this Court.

**The Bear Defendants' Auction of the Securities at Issue**

Beginning on the morning of August 10, 2007, the Bear Defendants distributed auction

solicitations (or "Bid Lists") for two groups of assets: (i) the 34 securities previously on repo

with BSIL under the GMRA, including nine Securities at Issue (the "BSIL Bid List"), and (ii)

the three securities previously on repo with BSC, including one of the Securities at Issue (the

"BSC Bid List").[49]  The Bear Defendants sent the Bid Lists to approximately 200 investors,

including, among others, investments banks, investment advisors, asset managers, pension funds,

hedge funds, and real estate investment trusts ("REITS").[50]  Bids for both the BSIL Bid List and

---

[46]Bear Appx. Ex. 131.

[47]Bear Appx. Ex. 133. Due to HomeBanc's subsequent default, the Bear Defendants asserted their rights under GMRA to withhold delivery of the securities identified in the August 8 Confirmations.  Bear Appx. Ex. 2 (GMRA) at A27 (§ 6(j), at A30 (§ 10(a)), and at A46 (Annex 1, ¶1(n)).

[48]Bear Appx. Ex. 1 (MRA, § 11), Ex. 2 (GMRA, § 10), Ex. 139 (default notice); Ex. 140 (default notice); Connell Aff. (A.D.I. #240) ¶29.

[49]Bear Appx. Ex. 141. The securities on the BSIL Bid List and the BSC Bid List are referred to as the "Auction Securities."

[50]Bear Appx. Ex. 26, Response to Interrogatory 25.

the BSC Bid List were due on August 14, 2007 by 3:00 p.m.[51]

The Bear Stearns repo finance desk (the "Repo Desk") also solicited bids from the Bear Stearns mortgage trading desk (the "Trading Desk").[52]  Bids by any Bear Stearns affiliate were required to be submitted 30 minutes prior to the close of the Auction to prevent other potential bidders from assuming that a Bear Stearns affiliate would have an advantage.[53]

The Trading Desk submitted an "all or none" bid of $60.5 million for all of the securities in the August 14, 2007 Auction.[54]  The Trading Desk's "all or none" bid of $60.5 million closely matched its aggregate pricing of the same securities in the period preceding the HomeBanc default under the Repo Agreements - - pricing which the Trading Desk had provided to the Repo Desk to set the terms for the repo transactions with HomeBanc prior to the default.[55] The only

---

[51]Bear Appx. Ex. 141. One of the securities on the BSIL Bid List (HMBT 2006-1X) (not one of the Securities at Issue) was removed from the August 14, 2007 Auction because of confusion about HomeBanc's purported pre-bankruptcy sale to JPMorgan for $1.0 million.  Bear Appx. Exs. 130, 145, 146.  Ultimately, a separate auction was held for that security on August 17, 2007.  Bear Appx. Exs. 152, 153.  The Trading Desk's bid of $1.256 million (the only bid received) was accepted. Bear Appx. Ex. 154.

[52]Bear Appx. Ex. 144.

[53]Bear Appx. Ex. 141 at A2512, Ex. 144 at A2527; Connell Aff. (A.D.I. #240) ¶40. Connell, who was a managing director at Bear Stearns & Co. Inc., stated that, upon advice of counsel, the Repo Desk took several affirmative steps to ensure that the Trading Desk was placed in the same position as any other arm's length bidder. Bear Stearns set up a "Chinese Wall" between the Repo Desk and the Trading Desk, prohibiting any auction-related communications between the Desks.  Connell stated that he delivered the Bid Lists to the Trading Desk by email and had no other substantive communications with the Trading Desk about the Auction until the Auction was closed.  The Bid Lists required that all bids by any party, including the Trading Desk, be submitted to an attorney in Bear Stearns' legal department located in another building, not to the Repo Desk.  This was done to ensure that the Repo Desk was not aware of any bids submitted prior to the close of the Auction, thereby further ensuring that the Trading Desk, even if it communicated with the Repo Desk regarding the Auction, would submit "blind" bids and the Repo Desk would be an objective auctioneer.  *Id.* ¶¶37-40.

[54]Bear Appx. Ex. 151.

[55]Bear Appx. Ex. 124, Ex. 127; Connell Aff. (A.D.I. #240) ¶43.  *See* n. 45, *supra.*

13

other party to submit a bid, asset management firm Tricadia Capital, LLC, submitted a bid for

two securities (not Securities at Issue), totaling approximately $2.19 million.[56]  Thus, the

Auction Securities were sold to the Bear Stearns Trading Desk.  After the August 14, 2007

Auction was completed, the Trading Desk worked with the Repo Desk to allocate the $60.5

million bid across the 36 Auction Securities.[57]

### III.   STANDARD - SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary

proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  At the

summary judgment stage, the court's function is not to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute as to

a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).  ("[A] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact.").  When the nonmoving party bears the burden of persuasion at trial, the moving party

---

[56]Bear Appx. Ex. 150. No competing bids were received for the Securities at Issue.

[57]Bear Appx. Ex. 157.

"may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D.Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999), or by relying on "conclusory allegations, improbable inferences and unsupported speculation." *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996). "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Id.,* quoting *Dow v. United Bhd. of Carpenters and Joiners of Am.*, 1 F.3d 56, 58 (1st Cir.1993).

Substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit will preclude summary judgment. *Anderson,* 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin. LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result."). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

15

## IV.    LEGAL DISCUSSION

A.  The Securities at Issue are "Repurchase Agreements" under Bankruptcy Code § 101(47)

(1)  *Repurchase Agreements and the Automatic Stay*

"Repurchase Agreements" are defined in the Bankruptcy Code.  11 U.S.C. § 101(47).

The Third Circuit described how a repurchase agreement works:

> A standard repurchase agreement, commonly called a "repo," consists of a two-part transaction.  The first part is the transfer of specified securities by one party, the dealer, to another party, the purchaser, in exchange for cash.  The second part consists of a contemporaneous agreement by the dealer to repurchase the securities at the original price, plus an agreed upon additional amount on a specified future date.

*In re Beville, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S & L Ass'n.*, 878 F.2d 742, 743

(3d Cir. 1989)).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

"expanded the definition of 'repurchase agreement' to include the transfer of 'mortgage related

securities . . . mortgage loans, and interests in mortgage related securities or mortgage loans.'"

*Calyon N.Y. Branch v. Am. Home Mortg. Corp.* (*In re Am. Home Mortg.*), 379 B.R. 503, 513

(Bankr. D. Del. 2008) ("*Calyon I*") (quoting 11 U.S.C. § 101(47)).  My colleague, Judge

Sontchi, has held that the following characteristics create one type of repurchase agreement

within the Code's definition:

> A repurchase agreement is an agreement, including related terms, which (i) provides for the transfer of one or more mortgage loans or interests in mortgage related securities or mortgage loans; (ii) against the transfer of funds by the transferee of such mortgage loans or interests in mortgage related securities or mortgage loans; (iii) with a simultaneous agreement by such transferee to transfer to the transferor thereof mortgage loans or interests in mortgage related securities or mortgage loans; (iv) at a date certain not later than 1 year after such transfer or on demand; and (v) against the transfer of funds.

*Id.* at 515.

16

The modern significant repo market requires liquidity to function in its current manner. *Calyon I*, 379 B.R. at 512.  A repo's liquidity provides assurance that the repo will be completed without delay and provides "quick protection against open ended market loss in the event of the bankruptcy of a dealer or other counter-party in the repo market."[58]  The Bankruptcy Code provides numerous exemptions that safeguard the liquidity attendant to repurchase agreements.[59] *Calyon I*, 379 B.R. at 512.

In general, filing a bankruptcy petition raises the Bankruptcy Code's protective "automatic stay."  11 U.S.C. § 362(a) ("except as provided in subsection (b) of this section, a [bankruptcy] petition filed under . . . this title . . . operates as a stay, applicable to all entities . . . .").  The automatic stay prohibits (among other acts) acts to collect, assess, or recover prepetition claims against the debtor.  11 U.S.C. § 362(a)(6).  It also prohibits the setoff of any prepetition debt owing to the debtor against any claim against the debtor.  *Id.* at (a)(7).

---

[58]James J. White, Steve H. Nickles and David G. Epstein, Bankruptcy, § 3-15:  Actions Against Estate Property–Setoff (West Group 1993).

[59]In *Calyon I*, the Court recognized that:
[S]ince 1982, Congress has enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the liquidity of the repo market by exempting repurchase agreements from significant provisions such as the automatic stay. More specifically, Congress has enacted:
- Sections 555 and 559, which protect the exercise of certain contractual rights to liquidate, terminate and accelerate repurchase agreements from stays, avoidance and other limitations;
- Sections 362(b)(7) and 362( o), which exempt from the automatic stay and all other Bankruptcy Code stays setoffs under repurchase agreements and the realization against collateral for repurchase agreements;
- Sections 546(f) and 548(d), which provide exemptions from preference and fraudulent transfer avoidance for settlement and margin payments; and
- Portions of sections 101 and 741, which define the key terms repurchase agreement, margin payment, settlement payment, repo participant and financial participant.

*Calyon I*, 379 B.R. at 512-13 (citing 5 COLLIER ON BANKRUPTCY ¶559.01).

Crucially, a party to an agreement qualifying as a repo under Bankruptcy Code § 101(47) may find refuge from these prohibitions, avoid the automatic stay, and undertake acts to collect, recover, or setoff prepetition debts without court approval.[60]

Section 559 of the Bankruptcy Code provides a "safe harbor" by placing a repo participant's exercise of contractual rights beyond the reach of the automatic stay.  11 U.S.C. § 559 ("the exercise of a contractual right of a repo participant . . . to cause the liquidation, termination or acceleration of a repurchase agreement . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title . . . .").  Although the Bear Defendants assert that all of the transactions under the GMRA and the MRA fall within the safe harbor of Bankruptcy Code § 559,  HomeBanc argues that the Securities at Issue are not "repos" and, thus, are not entitled to those benefits.

(2)    *The Securities at Issue are "repurchase agreements" under 11 U.S.C. § 101(47)*

The Bear Defendants argue that the documentation surrounding all transactions under the GMRA and the MRA, including transactions involving the Securities at Issue, reflect the parties' intent to engage in repo transactions.[61]   The Confirmations required for each transaction (and delivered for each of the Securities at Issue) begin with the phrase: "This confirms the repurchase transaction entered into between [the Bear Defendants] and [HomeBanc] on the

---

[60]*See* n. 59, *supra.*

[61]Each repurchase transaction is often referred to interchangeably as a "repurchase agreement" because the transaction calls for the security's sale and its repurchase at a future date.  *See* Trustee's S.J. Appx.(A.D.I. #233), Ex. 54, Frank J. Fabozzi & Steven V. Mann, *Repurchase and Reverse Repurchase Agreements*, in SECURITIES FINANCE: SECURITIES LENDING AND REPURCHASE AGREEMENTS (Frank J. Fabozzi & Steven V. Mann eds. 2005) p. 222.

Trade Date referred to below."[62]   There is no evidence that HomeBanc ever objected to the

characterization at the top of the Confirmations - - until this litigation began.[63]

Moreover, the parties' internal documentation referred repeatedly to the Securities at

Issue as "repo transactions" and included the Securities at Issue on lists of "outstanding repo

transactions."  In particular, on August 6, 2007, just before HomeBanc's bankruptcy filing,

James Krakau, known as a "clearinghouse" for information about HomeBanc's repo positions,

sent an internal email to a colleague regarding "a list of [HomeBanc's] repo debt at Bear," and

included each of the Securities at Issue on the list.[64]

HomeBanc argues, however, that regardless of the parties' designation of the Securities

at Issue in the correspondence and documentation, the Securities at Issue cannot qualify as repos

under the Bankruptcy Code because each Confirmation for the Securities at Issue had a purchase

price of zero. The HomeBanc Trustee argues that "there is no such thing as a zero purchase price

repo" because the securities must be transferred in exchange for *funds*.  HomeBanc relies upon

the definition in Bankruptcy Code § 101(47)(A)(i), which provides in pertinent part, that the

term "repurchase agreement" means:

> (i)     an agreement, including related terms, which provides for the transfer of
> one or more . . . mortgage related securities . . ***against the transfer of
> funds*** by the transferee of such . . . securities. . ., with a simultaneous
> agreement by such transferee to transfer to the transferor thereof . . .
> securities. . .at a date certain not later than 1 year after such transfer or on

---

[62] The Confirmation for one of the Securities at Issue (HMBT 2007-1I-3x) had a different format, but stated at the top: "We [Bear Stearns] bought from you under Reverse Repurchase Agreement . . ." Bear Appx., Ex. 3 at A60.

[63] The titles of the governing agreements, "Global Master Repurchase Agreement" and "Master Repurchase Agreement," are also instructive.

[64] Bear Appx. Ex. 126.  *See also* Bear Appx. Ex. 7 (Race Tr. 40:30 - 42:25).

demand, against the transfer of funds.

11 U.S.C. § 101(47)(A)(i) (emphasis added). *See Calyon I*, 379 B.R. at 515 (The securities must

be issued "against the transfer of funds by the transferee of such mortgage loans or interests in

mortgage related securities or mortgage loans.") HomeBanc contends that a zero purchase price

shows that the Securities at Issue were not transferred to the Bear Defendants "against the

transfer of funds." HomeBanc argues that the Bear Defendants did not lend any monies to it

against the Securities at Issue; instead, those securities were transferred to the Bear Defendants

and held for *future* lending transactions.[65]

   In response, the Bear Defendants rely upon section 13 of the GMRA which provides:

> Single Agreement.  Each party acknowledges that, and has entered
> into this Agreement and will enter into each Transaction hereunder
> in **consideration of and in reliance upon the fact that all
> Transactions hereunder constitute a single business and
> contractual relationship and are made in consideration of each
> other.**  Accordingly, each party agrees (I) to perform all of its
> obligations in respect of each Transaction hereunder, and that a
> default in the performance of any such obligations shall constitute a
> default by it in respect of all Transactions hereunder, and (II) **that
> payments, deliveries and other transfers made by either of them
> in respect of any Transaction shall be deemed to have been made
> in consideration of payments, deliveries and other transfers in**

---

[65]For example, Yancy Lockie, HomeBanc's former Vice President of Treasury, testified at his
deposition that, upon receiving the collateral sheets for the June 2006 Transactions, he contacted Ed
Neibert of the Bear Defendants to ask about the three Securities at Issue in that transaction.  Lockie
stated:
> And it's a recollection of a single phone call sometime around the original delivery of
> residuals to them in 2006, where they placed transactions on some, but not all of the securities.
> And my - - the gist of the conversation was: Ed, what are you going to do with these
> securities where you haven't lent us any money?
> Well, the response, the gist of the response was: Well, I'm going to hold them in the vault
> for you.
Bear Appx. Ex. 4 (Lockie Tr. 174:20- 175:6).

**respect of any other Transactions hereunder.**[66]

Thus, under a "bucket theory," the Bear Defendants claim that the unambiguous terms of the GMRA render each transaction consideration for every other transaction under the GMRA. The Bear Defendants argue that any transaction under the GMRA with a purchase price greater than zero provides sufficient consideration to satisfy the "transfer of funds" requirement of Bankruptcy Code § 101(47)(A)(i) with respect to the zero purchase price Securities at Issue.

HomeBanc argues in reply that the GMRA requires each transaction to be evidenced by a Confirmation and that, for the "bucket theory" to be applicable, the Confirmation should reflect a purchase price of *all* outstanding repo agreement amounts.  However, I agree with the Bear Defendants that the agreement set forth in section 13 of the GMRA applies regardless of the purchase price amount listed on the Confirmations.  Otherwise, every Confirmation would have to list the entire repo debt as its purchase price. The Single Agreement section is consistent with, and must be read as the backdrop for, each transaction.  There is no need to restate the Single Agreement section's overarching effect in every individual Confirmation.

The Bear Defendants also argue that the zero purchase price transactions satisfy the "catchall provision" of the Bankruptcy Code definition of repurchase agreements, which provides, in pertinent part, that a "repurchase agreement" means:

> any security agreement or arrangement **or other credit enhancement related to any agreement or transaction referred to in clause (i)**, (ii), (iii) or (iv) . . . .

11 U.S.C. § 101(47)(A)(v) (emphasis added).  The Bear Defendants argue that, at the least, the

---

[66]Bear Appx. Ex. 2 at A38 (GMRA § 13) (emphasis added). The GMRA is applicable to nine out of ten of the Securities at Issue. *(See* Bear Appx. Ex. 3, listing BSIL as the "buyer" on the Confirmations for nine of the Securities at Issue.)  The tenth security (HMBT 2007-1I-3x) is governed by the MRA, which includes a similar provision. Bear Appx. Ex. 1, ¶12 at A9.

zero purchase price transactions are arrangements or credit enhancements "related to" the master repurchase agreements, thereby qualifying as repurchase agreements under § 101(47)(A)(v). The Court agrees that the Securities at Issue, even if not outright repos, clearly are credit enhancements related to the MRA and GMRA, generally, and the June 2006 Transactions and June 2007 Transactions, specifically. Therefore, the Securities at Issue fall within the plain language of § 101(47)(A)(v) and are repurchase agreements under the Bankruptcy Code. Accordingly, the transactions involving the Securities at Issue are entitled to the benefits provided to repos in the safe harbor of Bankruptcy Code § 559.

(3)    *The Bear Defendants could exercise contractual rights related to the Securities at Issue*

HomeBanc argues that, even if the Securities at Issue are repos, they came "off repo" when repurchased by HomeBanc on August 8, 2007 for a zero purchase price, as evidenced by the Confirmations issued on that date.[67]  HomeBanc asserts that its repurchases obligated the Bear Defendants to return the Securities at Issue's corresponding certificates and attendant cash flows to HomeBanc and, since those securities were no longer repos as of the bankruptcy filing, the safe harbor of § 559 did not apply.

In response, the Bear Defendants contend that HomeBanc's failure to pay the repurchase amount of approximately $64 million when the term repos matured on August 7, 2007 enabled the Bear Defendants to exercise their contractual rights under the MRA and GMRA, which included withholding the Securities at Issue that were still in their possession as of the bankruptcy filing.

---

[67]Bear Appx. Ex. 133.

Bankruptcy Code § 559 provides in pertinent part that:

> The exercise of a contractual right of a repo participant . . . to cause the liquidation, termination or acceleration of a repurchase agreement . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court. . . .

11 U.S.C. § 559.  The term "repo participant" is defined in Bankruptcy Code § 101(46) as "an entity that, at any time before the filing of the petition, has an outstanding repurchase agreement with the debtor."  11 U.S.C. § 101(46).  Clearly, the Bear Defendants were repo participants and, therefore, the exercise of their contractual rights with respect to the Securities at Issue as of the bankruptcy filing was protected by § 559.  The proper inquiry regarding the Bear Defendants' obligation to transfer the Securities at Issue to HomeBanc must focus on the scope of the Bear Defendants' contractual rights under the MRA and GMRA.

Section 6(j) of the GMRA provides:

> If the parties have specified in Annex I hereto that this paragraph 6(j) shall apply, each obligation of a party under this Agreement . . . is subject to the condition precedent that none of those events specified in paragraph 10(a) . . . (being events which, upon the serving of a Default Notice, would be an Event of Default with respect to the other party) shall have occurred and be continuing with respect to the other party.[68]

In this case, the parties specified that section 6(j) would apply to the GMRA.[69]  The GMRA Guidance Notes discuss the effect of section 6(j):

> If it is specified to apply, then a condition precedent is introduced as a result of which **a party may withhold its payments and deliveries under the Agreement if a specified event of default occurs when one of the events specified in paragraph 10 has occurred in**

---

[68]Bear Appx. Ex. 2 at A27 (GMRA §6(j)).

[69]*Id.*, Annex I at A46.

**relation to the counterparty but the first party has not given the notice necessary to turn that event into an event of default under the Agreement.**[70]

HomeBanc argues that there was no default prior to the bankruptcy because an email dated August 8, 2007 from the Bear Defendants to HomeBanc, offered a one-day grace period to HomeBanc for payment of the term repos. The email states:

> Under the terms of the MRA and the GMRA, all aggregate Repurchase Prices for all such Transactions, and all other related amounts owing by HomeBanc Corp. to Bear, Stearns & Co. Inc. and Bear, Stearns International Limited, are due and payable in full by HomeBanc Corp. by the close of business today.
>
> Notwithstanding the foregoing, **and without in any way waiving any of its rights or remedies under the MRA or GMRA or otherwise,** Bear, Stearns & Co. Inc. and Bear Stearns International Limited have at the present time decided to give HomeBanc Corp. until the close of business tomorrow, Thursday August 9, 2007, to make all such payments in full . . . .[71]

The Bear Defendants, however, point out that the email explicitly reserved all of their rights under the master repurchase agreements.

It is undisputed that HomeBanc failed to make the required term repo payments on August 7, 2007, which was an event of default under GMRA § 10(a)(i).[72] Pursuant to section 6(j) of the GMRA, any obligation of the Bear Defendants to deliver the Securities at Issue was subject to the condition precedent that no "events which, upon the serving of a Default Notice,

---

[70]Bear Brief (A.D.I. # 236, Ex. B) "Guidance Notes for Use with the TBMA/ISMA Global Master Repurchase Agreement (2000 Version)," at 11 (emphasis added).

[71]Bear Appx. Ex. 131 (emphasis added).

[72]Bear Appx. Ex. 2 at A30. GMRA § 10(a)(i) provides that the following is an event of default:
(i)      Buyer fails to pay the Purchase Price upon the applicable Purchase Date or Seller fails to pay the Repurchase Price upon the applicable Repurchase Date, and the Defaulting Party serves a Default Notice on the Defaulting Party[.]

would be an Event of Default with respect to the other party . . . shall have occurred and be continuing."   As repo participants, the Bear Defendants' exercise of contractual rights under the GMRA were entitled to the §559 safe harbor protections.[73]

## B.  HomeBanc is entitled to the August Payment

HomeBanc argues that it is entitled to the August Payment of $759,832.62, which is the subject of Wells Fargo's Interpleader.[74]  HomeBanc contends that it was the undisputed registered certificateholder of the Interpleader Securities on the relevant record date.  HomeBanc contends that, because the trust agreements and ownership certificates related to the Interpleader Securities require payment to the certificateholder of record on the record date, the August Payment should be turned over to HomeBanc.  HomeBanc also asserts that this very issue (with the same Bear Defendants) was decided in favor of the registered certificateholder in *Wells Fargo Bank, N.A. v. Am. Home. Mortg. Inv. Corp.*, and subsequently affirmed by the District Court and the Third Circuit.[75]

The Bear Defendants disagree and argue that they are entitled to the August Payment because SMOREIT owned the Interpleader Securities on the applicable record date for the

---

[73] This analysis is applicable to the nine Securities at Issue that are subject to the GMRA.  At this time, no decision is made with respect to the Security at Issue subject to the MRA (HMBT 2007-1I-3x).

[74] The August Payment of $759,832.62 consists of principal and interest payments on four securities: HomeBanc 2005-2 ($151,699.94), HomeBanc 2005-4 ($175,214.02), HomeBanc 2005-5 ($194,809.32), and HomeBanc 2006-2 ($238,109.34) (the "Interpleader Securities"). Amended Complaint, A.D.I. # 11, ¶25.  The trust agreements and certificates that correspond with the four Interpleader Securities are found in HomeBanc Appx. (A.D.I. # 233) Exs. 74-81.
    HomeBanc has asserted a separate claim with respect to principal and interest payments made in July 2007 (referred to by the parties as the "July Repoed Securities Payment").  This Opinion does not address that claim.

[75] *Wells Fargo Bank, N.A. v. Am.. Home Mortg. Inv. Corp., et al.,* Adv. Pro. No. 07-51741, 2008 WL 4753342 (Bankr. D. Del. Oct. 30, 2008) ("*Wells Fargo*"), *aff'd* 409 B.R. 284 (D.Del. 2009), *aff'd*, 386 Fed. Appx. 209, 2010 WL 2676383 (3d Cir. July 7, 2010).

August Payment, by purchasing those securities at the August 14, 2007 Auction.  The Bear

Defendants admit that the Interpleader Securities were not re-registered  prior to the August 2007

record date, but assert that this failure should not entitle HomeBanc to a "windfall."

The *Wells Fargo* decision is directly on point and persuasive.[76]  Here, just as in *Wells*

*Fargo*, the issue is whether the Bear Defendants, as asserted owners of the Interpleader

Securities, or HomeBanc, as the registered certificateholder for the Interpleader Securities, is

entitled to the August Payment.  The trust documents are unambiguous; as in *Wells Fargo*, each

Ownership Certificate for the Interpleader Securities provides that "[t]here will be distributed on

[the Payment Date] **to the Holder at the close of business on the [Record Date]**, the amount to

be distributed to the Holder on such Payment date, all as provided in the Transfer and Servicing

Agreement and the Trust Agreement."[77]  Here, also as in *Wells Fargo*, the Trust Agreement for

the Interpleader Securities defines "Certificateholder" or "Holder" as "the Person in whose name

an Ownership Certificate is registered in the Certificate Register."[78]  Moreover, each Trust

Agreement provides in Section 3.05 as follows:

> <u>Persons Deemed Certificateholders.</u>  Prior to due presentation of an Ownership
> Certificate for registration of transfer, the Owner Trustee, the Certificate Registrar
> or any Certificate Paying Agent may treat the Holder as the owner of such

---

[76]*See Wells Fargo*, 2008 WL 4753342 at *1 ("The issue before the Court is whether Bear Stearns, as owner of the Trust Certificates under the repurchase agreement, or the debtors, as the registered holder of the Trust Certificate, are entitled to the payment.  The Court finds that, based upon the plain meaning of the controlling contracts, the monthly principal and interest payments are to be made to the registered holder, i.e., the debtors.").

[77]HomeBanc Appx. Ex. 75 at A458, Ex. 77 at A472, Ex. 79 at A486, and Ex. 81 at A500 (emphasis added, in bold).  *See also Wells Fargo*, 2008 WL 4753342 at *6 ("The Trust Agreement and Trust Certificate both provide that the monthly principal and interest payments are to be made to the holder of the Trust Certificate on the Record Date *as reflected in the "Certificate Register."*) (emphasis in original).

[78]HomeBanc Appx. Ex. 74 at A451, Ex. 76 at A467, Ex. 78 at A481, and Ex. 80 at A495.

26

> Ownership Certificate for the purpose of receiving distributions pursuant to
> Section 4.02 and for all other purposes whatsoever, and none of the Trust, the
> Owner Trustee, the Certificate Registrar or any Certificate Paying Agent shall be
> bound by any notice to the contrary.[79]

The undisputed facts show that SMOREIT did not re-register the Interpleader Securities prior to

the relevant August record date and, therefore, HomeBanc remained the registered Holder on the

relevant date.

The Bear Defendants, however, argue that certain emails from HomeBanc redirecting

distribution of the monthly payments to the Bear Defendants distinguish the case at bar from

*Wells Fargo*, in which the Court decided:

> The Repo Agreement is silent as to whether American Home Investment or Bear[]
> Stearns International is entitled to the monthly payments; and, absent an
> expressed intent of the parties in the Repo Agreement to supplant the clear and
> unambiguous terms of the Trust Documents, the terms of the latter agreements
> must control.

*Wells Fargo.*, 2008 WL 4753342 at *9. The Bear Defendants argue that the parties' express

intent to supplant the language in the trust documents is shown by emails. The first string of

emails includes one from Lockie (of HomeBanc) to Wells Fargo dated July 24, 2006, which

states:

> Please re-direct P&I payments on securities listed below including the OT class
> for each of the three series. Payments will be sent to Bear Stearns on behalf of
> HomeBanc. Please [b]egin with the 7/25/06 payments due HomeBanc. Please
> confirm by email.[80]

The response from Wells Fargo indicates that the payment instructions were updated as

---

[79]HomeBanc Appx. Ex. 74 at A455, Ex. 76 at A469, Ex. 78 at A483, and Ex. 80 at A497.

[80]Bear Appx. Ex. 62.

requested.[81]  However, the previous email in the email string from Neibert (of the Bear

Defendants) to Lockie dated June 26, 2006 requests redirection of  payments for a specific list of

securities - - which does *not* match the securities described by the parties as the Interpleader

Securities.[82]

A later email dated July 23, 2007 (i.e., not long before  HomeBanc's payment default and

subsequent bankruptcy) from Neibert to Lockie asks Lockie to re-direct monthly payments to

Bear Stearns for certain securities - - including two of the four Interpleader Securities.[83]  Lockie

responds that the redirection "process takes 5 business days - - they can not commit to a 7/25

distribution."[84]  Neibert's reply email states "Not a problem.  I will let my P&I area know."  This

exhibit does not include any subsequent instruction about redirection of payments to Wells

Fargo.[85]

Accordingly, the Bear Defendants' evidence does not demonstrate an express intent to

supplant the unambiguous language in the trust documents, which requires payment to the

registered Certificateholder for the Interpleader Securities.  Because HomeBanc was the

registered Certificateholder on the appropriate record date, the August Payment should be turned

over to HomeBanc.[86]

---

[81]*Id.*

[82]*Id.*

[83]Bear Appx. Ex. 105.  The list of securities included HMBT 2005-2R and HMBT 2006-2R.

[84]*Id.*

[85]*Id.*  In his deposition, when asked about this email, Lockie said that he did not believe he
submitted the request to Wells Fargo.  Bear Appx. Ex. 4 (Lockie Tr. 146:23 - 147:19).

[86]As more fully explained in *American Home Mortgage*, the Bear Defendants' "purchase of 'all
right, title, and interest' in the Trust Certificate did not include the absolute right to the monthly

C.  The Bear Defendants' Auction of the Securities at Issue

    HomeBanc filed cross-claims for breach of contract and wrongful conversion against the Bear Defendants alleging, in part, that the Bear Defendants disposed of the Securities at Issue through an Auction that did not comply with the terms of the GMRA and MRA, and was not conducted in good faith or in a commercially reasonable manner.

    (1)    *"Commercial Reasonableness" under Article 9 of the Uniform Commercial Code*

    HomeBanc argues that "the UCC's well-developed body of law on commercial reasonableness should inform" the Court's evaluation of the Bear Defendants' Auction because, HomeBanc asserts,  "based on a common sense interpretation of the [GMRA], BSIL was required to act . . . in a commercially reasonable manner."

    The Bear Defendants argue in response that other courts considering the same question already have decided that Article 9 does not apply to repurchase agreements.  *See Am. Home Mortg. Inv. Corp. v. Lehman Bros., Inc. (In re Am. Home Mortg. Holdings, Inc.) ("Lehman"),* 388 B.R. 69, 92 (Bankr.D.Del. 2008) ("As the MRA is a purchase and sale agreement, the commercial reasonableness standard of Article 9 does not apply. . . .), *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.,* 17 F.Supp.2d 275, 302 (S.D.N.Y. 1998) (the explicit language of the repurchase agreement evidences the parties' intent to treat the transactions as sales and purchases, and not loans, causing the Court to determine, as a matter of law, that the repurchase agreements were not subject to Article 9 of the UCC).

---

payments.  Rather, Bear Stearns International's right to the monthly payment was contingent upon Bear Stearns International becoming the Certificateholder listed in the Certificate Register.  Stated differently, Bear Stearns International purchased the ability to take steps to perfect its interest in the monthly income, i.e., the right to execute the necessary transfer documents and present them to the Certificate Registrar . . . ."  *Am. Home Mortg.* 2008 WL 4753342 at *8.

HomeBanc acknowledges that Article 9 may not be directly applicable to the repurchase

agreements, but contends that the Court should look to the well-developed body of law on the

subject of commercial reasonableness in analyzing the Auction because "neither law nor logic

suggests that the standard for determining 'good faith' or 'commercial reasonableness' should

differ or depend upon whether the obligations are imposed by the UCC or a contractual

provision, such as those contained in the Repurchase Agreements, especially since one provision

of the GMRA (Section 10(e)(ii)) uses the term "commercially reasonable" without defining the

term.[87]  I disagree.

Although the term "commercial reasonableness" appeared within the four corners of the

master repurchase agreement, the *Lehman* Court declined to apply Article 9, writing:

> The Court is not persuaded that a reference to "commercial reasonableness,"
> without any evidence that the reference is to Article 9's commercial
> reasonableness standard, implies that the parties agreed to Article 9's standard.

*Lehman*, 388 B.R. at 88, n. 95.  Similarly, the *Granite Partners* Court decided:

> The phrase "commercially reasonable manner". . . has been given special
> meaning under Article 9 of the UCC, and the totality of those concepts will not be
> imported wholesale into the [Public Securities Association Master Repurchase
> Agreement] to which . . . Article 9 does not apply.  The contract claim is to be
> interpreted under ordinary contract jurisprudence.

*Granite Partners*, 17 F.Supp.2d at 306.  As discussed in more detail below, the GMRA,

construed under English law rules of contract interpretation, provides that the non-Defaulting

Party has discretion to select the pricing sources and methods to determine the fair market value

of the securities, subject only to a rationality requirement.  Under these circumstances, it is not

appropriate to impose a specialized standard of "commercial reasonableness" upon the parties

---

[87]HomeBanc Brief, A.D.I. #244 at 56.  *See also* n. 92, *infra.*

when there is nothing in the GMRA to indicate that the parties intended such a result.

(2)    *Resolving conflicting interpretations of the term "reasonable" in the repurchase agreements*

The Bear Defendants argue that the Auction complied with the terms of the repurchase

agreements, which gave the Bear Defendants - - as the non-Defaulting Party - - discretion in

determining the "Net Value" of the securities. The GMRA provides that the agreement "shall be

governed and construed in accordance with the laws of England."[88]  English law provides that

the words of a contract are interpreted in accordance with their plain and ordinary meaning.

*Crown Cork & Seal Tech. Corp. v. Continental Pet Tech., Inc.,* 232 F.Supp.2d 294, 298 (D.Del.

2002) citing *Investors Compensation Scheme Ltd. v. West Bromwich Bldg. Soc'y*, [1998] 1

W.L.R. 896, 913 (Eng.).  If an ambiguity arises in interpreting a contract under English law,

then:

> [T]he court must always consider the objective facts and circumstances known to the parties at the time of the transaction - - known as the "factual matrix" - - and construe the contract consistently with its commercial purpose in order to arrive at a commercially sensible construction.

*In re McMahon*, 236 B.R. 295, 305 (S.D.N.Y. 1999) citing *Investors Compensation*, [1998]

1 W.L.R. at 912 (Eng.).

Upon an Event of Default, section 10(b) of the GMRA provides that "[t]he Repurchase

Date for each Transaction hereunder shall be deemed immediately to occur," and "performance

of the respective obligations of the parties . . . [including] payment of Repurchase Prices . . .

---

[88]Bear Appx. Ex. 2 at A40 (GMRA § 17).  Under Delaware law, express choice of law provisions in contracts are generally given effect.  *Hoinis Int'l Ent., Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D.Del. 1994) quoting *A.I.C. Ltd v. Mapco Petroleum, Inc.*, 711 F.Supp. 1230, 1237 (D.Del. 1989). Because nine out of ten of the Securities at Issue were transferred pursuant to the GMRA, the analysis will focus on that agreement.  *See* n. 73, *supra*.

shall be effected only in accordance with provisions of sub-paragraph (c) below."[89]   Section

10(c) establishes the method to calculate the amount due from each party to the other under the

agreement,  so that "the sums due from one party shall be set off against the sums due from the

other and only the balance of the account shall be payable."[90]   Section 10(c)(i) provides that

"[t]he Default Market Value of the Equivalent Securities . . . to be transferred . . . and the

Repurchase Price to be paid by each party shall be established by the non-Defaulting Party for all

Transactions as at *[sic]* the Repurchase Date"[91]   Because the Bear Defendants did not issue a

"Default Valuation Notice" to HomeBanc, section 10(e)(ii) provides that the "Default Market

Value" of

the securities "shall be an amount equal to their Net Value at the Default Valuation Time."[92]

The GMRA further provides that "Net Value" means:

---

[89]Bear Appx. Ex. 2 at A431(GMRA § 10(b)).

[90]*Id.* at § 10(c)(ii).

[91]*Id.* at § 10(c)(i).  The GMRA requires BSIL to determine the "Default Market Value" of "Equivalent Securities" rather than the purchased securities themselves because BSIL possessed "all right, title and interest" in the securities without encumbrance and, therefore, could choose to replace, sell or otherwise dispose of the securities at any time, making "the obligation of the party receiving Purchased Securities . . . an obligation to transfer Equivalent Securities."  *Id.* at § 6(f); *see also* § 1(a).  Here, BSIL did not transfer the purchased securities, so the Equivalent Securities were the purchased securities.

[92]*Id.* at § 10(e)(ii). Section 10(e)(ii) provides:
If by the Default Valuation Time [i.e., the fifth dealing day after the day on which the Event of Default occurs] the non-Defaulting Party has not given a Default Valuation Notice, the Default Market Value of the relevant Equivalent Securities . . . shall be an amount equal to their Net Value at the Default Valuation Time; provided that, if at the Default Valuation Time the non-Defaulting Party reasonably determines that, owing to circumstances affecting the market in the Equivalent Securities . . .it is not possible for the non-Defaulting Party to determine a Net Value of such Equivalent Securities . . . which is commercially reasonable, the Default Market Value of such Equivalent Securities . . . shall be an amount equal to their Net Value as determined by the non-Defaulting Party as soon as reasonably practicable after the Default Valuation Time.
*Id.; See also* § 10(d)(ii).

the amount which, in the *reasonable* opinion of the non-Defaulting Party, represents their fair market value, having regard to such pricing sources and methods . . . *as the non-Defaulting Party considers appropriate*, less, . . .all Transaction Costs which would be incurred in connection with the . . . sale of such Securities.[93]

The Bear Defendants argue that these provisions in the contract are a clear grant of discretion to them for the purpose of valuing the Securities at Issue upon HomeBanc's default. Specifically, the GMRA provides that the pricing sources and methods for determining Net Value are *"as the non-Defaulting Party considers appropriate."* On the other hand, HomeBanc argues that use of the term "reasonable" in the Net Value definition effectively neutralized any contractual discretion provided to the Bear Defendants and obligated the Bear Defendants to attain an objective standard of fair market valuation.

Under English law, "[i]t is very well established that the circumstances in which a court will interfere with the exercise by a party to a contract of a contractual discretion given to it by another party are extremely limited." *Socimer Int'l Bank Ltd. v. Standard Bank London Ltd.*, [2008] EWCA (Civ) 116, [¶62] (Court of Appeal) (Eng.) ("*Socimer*") quoting *Ludgate Ins. Co. Ltd. v. Citibank NA,* [1998] Lloyd's Rep. IR 221 [¶35] (Eng.) ("*Ludgate*"). The *Ludgate* Court determined:

> [P]rovided that the discretion is exercised honestly and in good faith for the purposes for which it was conferred, and provided also that it was a true exercise of discretion in the sense that it was not capricious or arbitrary or so outrageous in its defiance of reason that it can properly be categorised as perverse, the courts will not intervene.

*Id.* This anti-intervention presumption is even stronger in cases involving commercial contracts

---

[93]*Id.* at § 10(d)(iv) (emphasis added).

between sophisticated investors, in contrast to cases when consumer protection is a concern. *Socimer* at ¶122.[94]

The *Socimer* Court recognized two forms of "reasonableness." One is the objective type HomeBanc asks the Court to apply, which imposes a duty to take reasonable care, or arises when a contract requires the fixing of a reasonable price or a reasonable time. *Socimer* at ¶66. In these situations, "the concept of reasonableness is intended to be entirely mutual and thus guided by objective criteria." *Id.*

The second type of reasonableness is applicable when a contract effectively places the resolution of the parties' conflicting interests in the hands of the party exercising discretion. *Socimer* at ¶65 citing *Cantor Fitzgerald Int'l v. Horkulak* [2004] EWCA Civ 1287, [2004] IRLR 942, [2005] ICR 402 (14 October 2004) (Eng.). Then,

> a decision-maker's discretion will be limited, as a matter of necessary implication, by concepts of honesty, good faith, and genuineness, and the need for the absence of arbitrariness, capriciousness, perversity and irrationality. The concern is that the discretion should not be abused.

*Socimer* at ¶66.[95] The *Socimer* Court decided that this discretionary form of reasonableness, "in which the decision remains that of the decision-maker" should be referred to as a *rationality test*, which is distinguished from situations using an "entirely objective criteria of reasonableness [when] the decision maker becomes the court itself." *Id.*

---

[94] The *Socimer* Court noted: "Standard's position is governed by its commercial contract not by the law of equity. This is the world of sophisticated investors, not that of consumer protection. These merchants in the securities of emerging markets have made an agreement which speaks of the need for a spot valuation, not of the more leisurely process of taking reasonable precautions, such as properly exposing the mortgaged property for sale, designed to get the true market price by correct process." *Socimer*, at ¶122.

[95] This type of "reasonableness" is also referred to as *Wednesbury* reasonableness, arising from the decision *Associated Provincial Picture Houses Ltd. v. Wednesbury Corp.* [1948] 1 KB 223 (Eng.).

The GMRA definition of "Net Value" designates the non-Defaulting Party (here, the

Bear Defendants) as the decision-maker with respect to the fair market value of the securities,

including use of pricing sources and methods "as the non-Defaulting Party considers

appropriate." HomeBanc distinguishes the *Socimer* decision, arguing that the *Socimer*

agreement gave the non-defaulting party "sole and absolute discretion," unlike the GMRA,

which tempers any exercise of discretion to the "reasonable opinion of the non-Defaulting

Party."[96]   The GMRA's language addressing the post-default valuation does not indicate that the

---

[96]Bear Appx. Ex. 2 at A31 (GMRA § 10(d)(iv)). HomeBanc also argues that the *Socimer* Court distinguished the "sole and absolute discretion" language from the "standard set of terms known as the PSA/ISMA type agreements which made provision for a 'Default Market Value' and which did not give to the seller the wide discretion which at that time was common ground . . . [given] to the seller in a default situation." *Socimer* at ¶117. HomeBanc argues that the GMRA is not like the *Socimer* agreement, but is similar to the PSA/ISMA agreements that do not grant wide discretion. In response, the Bear Defendants filed a Motion for Leave to Supplement the Record with Materials Discussed at Oral Argument (A.D.I. 276) (the "Motion to Supplement"), seeking to provide the Court with the "PSA/ISMA type agreements" referenced in the *Socimer* decision: *i.e.,* form agreements identified by the names of their sponsoring entities, the Public Securities Association ("PSA") and the "International Securities Market Association ("ISMA") published in 1992 and 1995. Motion to Supplement, Ex. B and C. The Bear Defendants contend that, after the PSA became the Bond Market Association ("TBMA") in 1997, the repurchase agreements were substantially revised in 2000 and re-labeled the TBMA/ISMA Global Master Repurchase Agreement," which is the form of the GMRA executed by the parties in 2005.

In response to the Motion to Supplement, HomeBanc does not object to supplementing the record, but disagrees with the Bear Defendants' analysis of the attached documents. Therefore, I will grant the Motion to Supplement and review the 1992 and 1995 PSA/ISMA agreements.

The Bear Defendants point out that the 1992 and 1995 PSA/ISMA agreements contain a non-discretionary standard by which a repo buyer values securities following default by a repo seller. Motion to Supplement, Ex. B (1992 version) §§ 2(j), 2( r), and 10(b)(i) (the default market value is "the price for such Securities at such time on such date obtained from a generally recognised source *agreed to by the parties* . . . . )(emphasis added); Ex. C (1995 version) §§ 2(j)(i)(bb), 2(y) (same). The Bear Defendants claim that this standard is markedly different from the GMRA, which grants discretion by allowing the non-Defaulting Party to chose the pricing sources and methods to determine "Net Value."

HomeBanc argues, instead, that comparing the 1992 and 1995 versions of the repo agreements with the GMRA demonstrates an evolution to an even more objective standard for valuing collateral after a default, because the GMRA adds terms like "reasonable," "fair market value" and "commercially reasonable."

I disagree with HomeBanc and conclude that the revised language found in the GMRA grants discretion to the non-Defaulting Party, rather than using a mutual, objective standard, although (consistent with the *Socimer* decision) the addition of the term "reasonable" tempers that discretion by a *rational* standard.

value determination should be a mutual or objective one. Accordingly, the Bear Defendants had the contractual right to exercise discretion in choosing a rational manner in which the Net Value of the securities should be determined.

The terms "reasonable" and "commercially reasonable" also appear in section 10(e)(ii) of the GMRA, which permits the non-Defaulting Party to decide whether circumstances in the applicable securities market prevent determination of a "commercially reasonable" value for the securities. Again, the decision-making about timing of valuation is left to the non-Defaulting Party, subject to a rationality test.

Because the GMRA grants the non-Defaulting Party (in this case, the Bear Defendants) contractual discretion with respect to post-default valuation of the securities, the circumstances in which this Court should intervene with the Bear Defendants' exercise of discretion to value the Securities at Issue are limited. This is especially true given the sophistication of the parties. The Bear Defendants' exercise of discretion must not be arbitrary or capricious, but made honestly and in good faith.

(3) *Whether the timing and manner of the Auction was in good faith*

While not subject to an objective standard of reasonableness or an Article 9 standard of "commercial reasonableness," the GMRA, nonetheless, requires the Bear Defendants to exercise its discretion "rationally," or in good faith. HomeBanc argues that the undisputed facts show that the Bear Defendants failed to act in good faith when they sold the Securities at Issue to themselves "for pennies on the dollar using an Auction process that was successfully rigged to ensure that Bear Stearns would be the only bidder." In particular, HomeBanc claims the Bear

Defendants' lack of good faith is shown by conducting an auction sale in a dysfunctional market and by failing to ensure that the bidding process was fair.

      a.    <u>Dysfunctional Market</u>

There appears to be no dispute that the repo market was deteriorating in August 2007. While both Bankruptcy Code § 559[97] and the GMRA allow for liquidation of the repo securities, HomeBanc argues that the Bear Defendants' use of an Auction in August 2007, a time when all parties agree the market was in turmoil, is evidence that the Bear Defendants' exercise of that discretion was irrational or in bad faith.

HomeBanc relies upon the decision *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181 (Bankr.D.Del. 2009) *aff'd* 637 F.3d 246 (3d Cir. 2011) ("*Calyon II*")[98] to support its argument that a discounted cash flow valuation ("DCF Analysis") is an appropriate - - and the best - - method to value the Securities at Issue in a dysfunctional market. HomeBanc offers its own

---

[97] The relevant portion of § 559 specifically permits a repo participant to exercise a contractual right to liquidate securities without interference by a bankruptcy court, providing:

> The exercise of a contractual right of a repo participant . . . to cause the liquidation . . . of a repurchase agreement . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title . . . . In the event that a repo participant . . . liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of setoff.

11 U.S.C. § 559.

[98] The parties in *Calyon II* filed a joint certification for direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2)(A), so the Court disposed of this matter on direct appeal from the Bankruptcy Court. *See Calyon II*, 637 F.3d at 254.

expert's DCF Analysis as better evidence of value of the Securities at Issue after HomeBanc's

default.

HomeBanc's reliance on *Calyon II*, however, is misplaced. In that case, both the debtor

and the repo participant (Calyon) asked the *Calyon II* Court to determine Calyon's deficiency

damage claim pursuant to Bankruptcy Code § 562, which provides that a repo participant's

"damages shall be measured as of the earlier of . . . the date or dates of such liquidation,

termination or acceleration."  Subsection (b) of § 562 further provides:

> If there are not any commercially reasonable determinants of value as of any date
> referred to [above], damages shall be measured as of the earliest subsequent date
> or dates on which there are commercially reasonable determinants of value.

11 U.S.C. § 562(b).  The debtors in *Calyon II* argued that a DCF Analysis as of the acceleration

date valued the Loan Portfolio at or above the repurchase price, resulting in no deficiency claim

for Calyon. Calyon argued that no "commercially reasonable determinants of value" existed on

the acceleration date because the only appropriate valuation methodology for the Loan Portfolio

is the market value, and the market for the Loan Portfolio was distressed on that date.  Calyon

contended that the earliest date on which there existed a commercially reasonable determinant of

value was a year after default, August 15, 2008.  The *Calyon II* Court disagreed, writing that:

> [T]he Court finds that the phrase "commercially reasonable determinants of
> value" as used in Section 562 of the Code means that any commercially
> reasonable valuation methodology may be used as evidence of the damages under
> a repurchase agreement after its rejection, liquidation, termination or acceleration.

*Calyon II,* 411 B.R. at 193.  The *Calyon II* Court then determined that the debtor's expert's DCF

Analysis was a "commercially reasonable methodology for determining the value of the Loan

Portfolio."  *Calyon II*, 411 B.R. at 198.

In this case, the Bear Defendants are not seeking damages under Bankruptcy Code § 562

and the reasoning of *Calyon II* is not applicable.  The Bear Defendants' liquidation of the

Securities at Issue by Auction pursuant to § 559 requires a different analysis than the damages

question of § 562, as recognized by the Third Circuit in affirming *Calyon II* writing:

> Sections 559 and 562 address different situations. Section 559 applies only in the
> event that a repurchase agreement is liquidated, and the liquidation results in
> excess proceeds (where the proceeds from the market prices exceed the stated
> repurchase prices). If any assets are not disposed of on the date of liquidation,
> those assets are valued at the prices available at the time of liquidation from a
> generally recognized source or the most recent closing bid quotation from such a
> source. On the other hand, § 562 which covers, inter alia, repurchase agreements,
> applies when the contract is liquidated, terminated, or accelerated, and results in
> damages rather than excess proceeds.

*Credit Agricole Corporate and Inv. Bank v. Am. Home Mortg. Holdings, Inc. (In re Am. Home*

*Mortg. Holdings, Inc.)*, 637 F.3d 246, 255-56 (3d Cir. 2011).  Section 562's requirement for an

objective determination of market value, through a DCF Analysis or other "commercially

reasonable determinants of value," protects a defaulting repo participant when the non-defaulting

party seeks deficiency damages.  In discussing the purpose and intent of § 562, the Bankruptcy

Court noted:

> Section 562 serves to align the risks and rewards associated with
> an investment in those assets.  By fixing damages as of the date the
> repurchase agreement is terminated, accelerated, etc. the Code
> attempts to prevent a moral hazard.  If damages were measured at
> some future date, the repo participant could hold the asset at little
> or no risk.  If the price of the asset were to rise, the repo participant
> would capture that increase up to the full amount owed under the
> agreement.  If the price were to fall, however, the repo
> participant's losses would be covered because its deficiency claim
> would rise accordingly. . . .  In effect, this would make the debtor
> an insurer of the repo participant's investment even though the
> debtor has no control over the management of the asset - - thus, the
> moral hazard.

*Calyon II,* 411 B.R. at 191.  The concerns addressed by the *Calyon II* Court and § 562 do not

align with the issue before me.  Section 559 does not use the phrase "commercially reasonable determinants of value" and does not require the backward-looking analysis found in § 562.

Instead, § 559 specifically permits disposing of assets by liquidation at "market prices."[99] The difficulties in deciding when to liquidate assets upon an event of default was recognized in the *Socimer* decision:

> Thus, in the specific context of a default and forced retention of Designated Assets, [Standard Bank of London Ltd., the non-defaulting party,] is compelled by the buyer's default to retain what it never sought, save to the extent that it can immediately liquidate the assets on the termination date.  The question whether it can sensibly in the interests of either party liquidate on the termination date is part of the complex uncertainties of this emergency situation.  If it decides not to liquidate, it is forced to retain.  If in that context it has to value the assets, why should it not be entitled to value them at a value which reflects the value of such assets to itself?  It may dislike the risk they pose, in terms of the nature of the particular asset, its currency and/or nationality and so on.  The decisions have to be taken very quickly, namely, "on the date of termination" . . . . Once the asset is not immediately sold, the risk of retention is entirely transferred to Standard.  In theory and sometimes in practice anything may happen the next day, or within the time in which a sale might become possible.  The difficulty multiplies if the asset is relatively or entirely illiquid.  Then there is no market price by which the value can be set on the relevant day.  Who knows at what price the asset can be sold when a buyer appears? In such circumstances, Standard is entitled, it may be said, to consult its own interests, subject of course to the requirements of good faith and rationality.  Those factors include both subjective and objective elements, but the essence of that construction is that the decision remains that of Standard, not of the market or the court, and that in coming to its assessment, subject to the limitations of good faith and rationality, it is entitled primarily to consult its own interests.

*Socimer*, at ¶112.

It is not appropriate to use hindsight to declare the Bear Defendants' decision to liquidate the Securities at Issue (along with the other repo securities) in August 2007 as irrational  due to the market's "dysfunctional" status at that time.  Bankruptcy Code § 559 permits liquidation of the securities in accordance with a party's contractual rights, and the GMRA permits the Bear

---

[99] *See* n. 97, *supra.*

Defendants to act within their discretion. As discussed in *Socimer*, the decision to liquidate is

complex and full of uncertainty, with risks arising whether the securities were sold or retained.

As aptly decided by the *Socimer* Court:

> The hindsight imposition of an objective market value for an assessment which had to be
> done in an emergency on the termination date itself, in respect of Standard's own
> property, which it was forced in breach of contract and against its will to retain, would be
> unfair and uncommercial.

*Socimer*, at ¶94. Although there was no emergency requiring valuation by the "termination

date" in the proceeding now before me, the *Socimer* Court's reasoning is pertinent. The GMRA

grants the non-Defaulting Party (here, the Bear Defendants) discretion to determine the Net

Value as of the Default Valuation Time (defined as "the close of business in the Appropriate

Market on the fifth dealing day after the day on which that Event of Default occurs. . .") or as

soon as reasonably practicable after the Default Valuation Time.[100] It is not bad faith to

determine Net Value on or about the negotiated agreement's "Default Valuation Time."

    b.    <u>Bidding Process</u>

HomeBanc also contends that there is substantial evidence - - or more than needed to

raise a genuine dispute about material facts  - - demonstrating that the Bear Defendants failed to

conduct the Auction in good faith.[101] HomeBanc's objections are specific to the ten Securities at

---

[100]Bear Appx. Ex. 2 at A35 (GMRA ¶10(e)((ii)).

[101]HomeBanc cites to numerous cases holding that a disputed issue of material fact arises about
the commercial reasonableness of a sale when (i) a sale results in a discrepancy between the sale price and
the fair market value of an asset, or (ii) when a creditor/seller sells the debtor's property to itself.
Similarly, HomeBanc argues that the Bear Defendants' failure to provide notice of the Auction to
HomeBanc raises an issue of commercial reasonableness. However, each of the cases cited by
HomeBanc for these propositions apply the standard for commercial reasonableness under Article 9 of the
Uniform Commercial Code. *See* HomeBanc Brief, A.D.I. 244 at 59 - 62. For the reasons set forth above,
that standard is not applicable to this litigation.

Issue, rather than the entire group of thirty-six securities sold at the Auction.

Because the Securities at Issue are difficult to value due to their complex characteristics (i.e., mostly residual tranches with various transfer restrictions), HomeBanc argues that the Bear Defendants did not provide sufficient time and information to allow potential bidders to evaluate and price the Securities at Issue properly. HomeBanc argues that notice of the Auction was "woefully inadequate" because potential bidders received notice by email on Friday, August 10, 2007, or as late as the morning of August 14, 2007, for bids that were due on August 14, 2007 at 3:00 p.m. Further, HomeBanc claims the Bear Defendants did not make an effort to identify and target buyers who were qualified or interested in purchasing the Securities at Issue.[102] Finally, HomeBanc also argues that the result of the Auction - - sale of the Securities at Issue to itself at an "egregiously low" price - - is evidence of bad faith.

To support its arguments that the Auction was not in good faith, Homebanc cites to a number of cases that evaluated sales under the Article 9 "commercial reasonableness" standard and proffered expert testimony by affidavit opining that the Auction process was not "commercially reasonable."[103] However, I have already decided that the Article 9 commercial reasonableness standard is neither applicable to this Auction nor helpful to the Court.

Instead, the Bear Defendants' point to evidence demonstrating that the Auction process used for the securities was in accordance with the usual practices in the industry at that time. For

---

[102] A number of the Securities at Issue were subject to transfer restrictions, in particular a REIT (real estate investment trust) restriction which limited qualified buyers to those eligible to own such securities.

[103] See Trustee's Opp. Brief, A.D.I. 244 at 59 - 62. HomeBanc's expert opined, among other things, that the Auction was not commercially reasonable in its design and execution, was neither structured nor executed in a manner that would maximize proceeds, and did not result in an "effective realization." Trustee's Opp. Appx., A.D.I. 245 at Ex. 25, p. 19.

example, a non-party witness (a Fortis Bank mortgage-backed securities trader deposed by the

HomeBanc Trustee) stated that the time frame for submitting bids was typical:

> Q:    When you were receiving these e-mail bid solicitations in 2007, what was the normal response time in which you had to evaluate whether you would be interested or not?
>
> A:    It depended, it was dependent on the seller. [S]ome bid lists require coming back an hour later, others require the afternoon, others require 24 hours, others gave us more.  It was no - - there was no, no standard decision as to what  - - what time you need.  So it's possible that somebody at 7:00 in the morning would ask you to bid at 10:00 in the morning, and at 2:00 in the afternoon, at 3:00 in the afternoon or the next day, and depending on your workload, you would be able to meet that deadline or not.[104]

Similarly, another non-party witness (a Credit Suisse mortgage-backed securities trader)

testified:

> Q:    In your experience, it's not unusual for a seller to seek bids on residential mortgage-backed securities in a manner that Bear Stearns did in this case, right?
>
> A:    Not at all, yeah.
>
> Q:    Okay.  And, in fact, over-the-counter securities like those identified in the bid solicitation letters that you - - that you reviewed earlier, are sold by auction all the time, not just in connection with liquidations, correct?
>
> A:    Correct.
>
> Q:    Okay.  And if you had been interested in purchasing these securities, you would have contacted Bear Stearns and placed a bid, correct?
>
> A:    Yes.
>
> Q:    Okay. And there's certainly nothing inappropriate about the way that Bear Stearns sought bids in this manner that we've reviewed earlier today, correct?
>
> A:    Not that I can - - not that I can tell from here, no.[105]

The same witness also stated that the information provided about the securities in the

email requesting bids was typical:

> Q:    If you received an e-mail bid solicitation for the sale of mortgage-backed securities, what information would you need to evaluate whether Credit Suisse was interested in purchasing that security?

---

[104]Bear Appx. Ex. 17 (Torres Tr. 28:25 - 29:16).

[105]Bear Appx. Ex. 16 (Herr Tr. 52:10 - 53:6).

A:      [P]rimarily the information that's listed on this bid solicitation is, you know, pretty much market standard.  You give the security name, the CUSIP, the original face, which is the amount they're looking for a bid on.  And the factor, obviously, is helpful.

. . . .

Q:      Would there be additional information that you would seek from the seller of the securities?
A:      It would depend on the security.

. . . .

Q:      What if the bid solicitation was for the sale of residual interests in mortgage-backed securities, would you require more information from the seller?
A:      Likely not, typically. . . .[106]

The Bear Defendants also cite to testimony of a Bear Stearns employee stating that Bear

Stearns' Repo Desk sought to distribute notice of the Auction widely.  When asked who made

decisions about potential bidders, he responded:

A:      [W]e worked with sales, and specifically senior people in sales, and we tried to do as wide a distribution as we could to get prices.  So I know we sold it to various clients to try to get - - to try to solicit interest. . . .
. . . .
Q:      Were you satisfied that there was an appropriate distribution in connection with this auction?

A:      Yes. . . . [I]t went to a very wide variety of names and included all sorts of different types of clients, REITS, banks, hedge funds.  Frankly, I don't think you could have had a better, more widely distributed list of clients to look at this, in my opinion. . . . [107]

The depositions and other materials submitted in support of the summary judgment

motions support the Bear Defendants' position that the bidding process was typical in the

---

[106]Bear Appx. Ex. 16 (Herr Tr. 22:12 - 24:14).  *See also* Bear Appx. Ex. 13 (Andrews Tr. 89:22 - 90:20), Ex. 15 (Ha Tr. 41:8 - 43:24), Exs. 141, 142, 143 (bid solicitation emails).

[107]Bear Appx. Ex. 9 at A596, A600 (Chasin Tr. 80:20 - 80:24, 97:9 - 97:20).  *See also* Bear Appx. Ex. 26, Ex. A (distribution lists for bid solicitations).

industry at that time, and, therefore, I cannot conclude that the Auction was conducted in bad faith.

Finally, the fact that the Auction resulted in the sale of the securities to the Bear Stearns Trading Desk is not *per se* evidence of bad faith. It is not disputed that the Bear Stearns Trading Desk submitted an "all-or-none" bid of $60.5 million for all of the Auction Securities, which closely matched an offer made to HomeBanc by Bear Stearns to purchase the Auction Securities at about the time of HomeBanc's default. [108] HomeBanc argues that these facts demonstrate that the process was rigged to prevent competing bids because the Trading Desk had the advantage of knowing the amount previously offered by Bear Stearns to purchase the securities, while other potential bidders were denied sufficient time and information to prepare a competing bid. In response, the Bear Defendants argue that the integrity of the Auction process was assured because, on the advice of counsel, the Bear Stearns Repo Desk took steps to ensure that the Bear Stearns Trading Desk was placed in the same position as other arm's length bidders.[109] Brian Connell, a former Managing Director on Bear Stearns' Repo Desk, stated (by affidavit) that the following steps were taken:

- Bear Stearns set up a "Chinese Wall" between the Repo Desk and the Trading Desk, prohibiting any auction-related communications between the Desks.[110]

- Bids were not submitted to the Repo Desk, but to an attorney in Bear Stearns' legal department located in a different building. Thus, the Repo Desk was not aware of any bids received prior to the close of the Auctions.[111]

---

[108] *See* n. 45, *supra.*

[109] Connell Aff. (A.D.I. #240) at ¶37.

[110] *Id.* at ¶38.

[111] *Id.* at ¶39.

- To assure other potential bidders that no Bear Stearns affiliate would gain an advantage in the Auction, the bid lists stated that any Bear Stearns bid was required to be submitted 30 minutes prior to the close of the Auctions.  Thus, the Trading Desk was not able to simply match or beat the highest bid received in the Auctions, as other participants would have the ability to submit bids later than the Trading Desk.[112]

The steps taken to ensure fairness to third party bidders were adequate under the circumstances and do not demonstrate bad faith.  No evidence has been submitted to the contrary.  HomeBanc's assertion that the Bear Defendants' sale of the Securities at Issue to itself for a low price rests on the Article 9 commercial reasonableness standard, which is not applicable to this case.  Therefore, I conclude that the Bear Defendants' Auction was not in bad faith.

## IV.  CONCLUSION

For the reasons set forth above, partial summary judgment will be granted in favor of HomeBanc on the claim for turnover of the August Payment.  Further, partial summary judgment will be granted in favor of the Bear Defendants with respect to the following limited issues: (a)  The transactions related to the Securities at Issue are "repurchase agreements" as defined in Bankruptcy Code § 101(47) that fall within the safe harbor of Bankruptcy Code § 559, and (b) The Bear Defendants' Auction was not conducted in bad faith, and was neither a violation of the automatic stay nor a breach of contract with respect to nine of the ten Securities at Issue.[113]   The Motion to Supplement will also be granted.[114]

---

[112]*Id.* at ¶40.

[113]*See* n. 73, *supra*.

[114]*See* n. 96, *supra*.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: January 18, 2012