## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| HOMEBANC MORTGAGE CORP., *et al.*[1] | ) | Chapter 7 |
| | ) | |
| Debtors | ) | Case No. 07-11079 (KJC) |
| | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., in its | ) | |
| capacity as Securities Administrator, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Case No. 07-51740 (KJC) |
| | ) | (D.I. 15, 129, 134) |
| v. | ) | |
| | ) | |
| HOMEBANC CORP., BEAR, STEARNS & CO., | ) | |
| INC., BEAR, STEARNS INTERNATIONAL | ) | |
| LIMITED, AND STRATEGIC MORTGAGE | ) | |
| OPPORTUNITIES REIT, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION[2]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Much has been written about what has come to be known as the subprime mortgage

crisis, including numerous newspaper accounts, scholarly articles, and popular books.[3]  For the

undersigned, it began on April 2, 2007, with the chapter 11 filing of New Century TRS Holdings,

Inc., at the time, the second largest subprime lender behind Countrywide Securities Corporation

---

[1]The related entities that filed chapter 11 petitions are: HomeBanc Mortgage Corporation, HomeBanc Corp., HomeBanc Funding Corp. II, HMB Acceptance Corp., HMB Mortgage Partners, LLC, and HomeBanc Funding Corp. (the "Debtors" or "HomeBanc").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052.

[3] *See, e.g.,* Michael Lewis, *The Big Short: Inside the Doomsday Machine,* (W.W. Norton & Co. 2011).

and the largest chapter 11 filing of 2007. The subprime mortgage crisis was but a prelude to the collapse of the United States financial markets later in 2008.

The matter now before me involves the chapter 7 Trustee's challenge to decisions made by Bear Stearns[4] in August 2007 after HomeBanc defaulted under certain repurchase agreements and subsequently commenced a chapter 11 case. After HomeBanc's default, the Bear Stearns repo desk liquidated certain repurchase agreement assets (residential mortgage-backed securities) by means of an auction, but the highest bid received was from Bear Stearns' own trading desk. The Trustee for HomeBanc's now chapter 7 case objects to Bear Stearns' use of an auction to value the securities, claiming the market in August 2007 was dysfunctional, thereby making it impossible for a reasonable price to be obtained for these securities. Proof of this, the Trustee asserts, lies, in part, in the fact that the securities increased substantially in value after the auction.

The Bankruptcy Code recognizes the "need for speed" in connection with the enforcement of contractual rights by non-defaulting parties under certain financial contracts.[5] "Congress has enacted exceptions to the general rule disallowing *ipso facto* clauses for swaps and certain other types of financial contracts to address volatility in the financial markets which 'can change significantly in a matter of days, or even hours . . . . [A] non-bankrupt party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality.'"[6] The Bankruptcy Code offers a safe harbor allowing

---

[4] Defendants Bear Stearns & Co., Inc., Bear Stearns International Limited and Strategic Mortgage Opportunities REIT, Inc. are jointly referred to herein as "Bear Stearns."

[5] *See, inter alia,* 11 U.S.C. §§ 559 - 562; § 362(b)(6), (7), (17), (27).

[6] *Michigan State Housing Dev. Auth. v. Lehman Bros. Derivative Prod. Inc. (In re Lehman Bros. Holdings, Inc.),* 502 B.R. 383, 392 (Bankr. S.D.N.Y. 2013) quoting H.R. Rep. No. 101-484, at 2 (1990) *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (discussing 11 U.S.C. § 560 and swap agreements).

parties to exercise contractual rights without being impeded by the automatic stay or "otherwise limited" by any Bankruptcy Code provision or order of the Bankruptcy Court.[7]

The trial evidence showed that although participants in the market in August 2007 knew the market was "stressed," trades were, in fact, taking place.  Bear Stearns followed the usual procedures for selling residential mortgage-backed securities by auction.  I conclude that Bear Stearns' auction of repurchase agreement collateral in August 2007 was rational, in good faith and in compliance with the Global Master Repurchase Agreement.

## BACKGROUND

On August 9, 2007 (the "Petition Date"), the Debtors filed voluntary chapter 11 bankruptcy petitions.  By Order dated February 24, 2009, the cases were converted to a chapter 7 liquidation, and on February 25, 2009, George Miller was appointed as chapter 7 trustee (the "Trustee").

On October 25, 2007, Wells Fargo Bank, N.A. ("Wells Fargo") commenced this adversary proceeding by filing an interpleader complaint against three parties:  (i) HomeBanc Corp., (ii) Bear, Stearns & Co., Inc. ("BSC"), and (iii) Bear, Stearns International Limited ("BSIL").[8]  Wells Fargo was securities administrator, paying agent, note registrar and certificate registrar for certain mortgage-backed certificates held by Bear Stearns.  Wells Fargo filed the Interpleader Complaint because HomeBanc and Bear Stearns asserted competing claims to the principal and interest payment due on the mortgage-backed certificates for the month of August 2007 (the "August Payment").  Pursuant to an Order dated June 2, 2011, Wells Fargo deposited

---

[7] *See, e.g.,* 11 U.S.C. § 559.

[8] Wells Fargo amended the Interpleader Complaint on November 19, 2007, adding Strategic Mortgage Opportunities REIT, Inc. ("SMOREIT") as a defendant.  BCS, BSIL and SMOREIT, together, are referred to jointly herein as "Bear Stearns".

the August Payment with this Court and was subsequently dismissed from the adversary proceeding on June 8, 2011.

As part of the adversary proceeding, Bear Stearns and HomeBanc filed cross-claims against each other. [9] The Trustee's amended cross-claims against Bear Stearns asserted eight counts, including Breach of Contract, Conversion, Turnover of Property of the Estate, Violation of the Automatic Stay, Unjust Enrichment, Avoidance and Recovery of a Preference, Accounting and Breach of Fiduciary Duty. Bear Stearns filed two cross-claims against HomeBanc: Breach of the Repurchase Agreement, and Unjust Enrichment.

On December 7, 2010, the Trustee and Bear Stearns filed cross-motions for summary judgment. In their papers and at oral argument, the parties focused their attention on three issues. By Opinion and Order dated January 18, 2013 (referred to herein as *HomeBanc I*),[10] I decided those three issues as follows:

(1)    certain transactions between HomeBanc and Bear Stearns relating to specific securities are repurchase agreements under Bankruptcy Code § 101(47), and, therefore, Bear Stearns' exercise of its contractual rights with respect to those securities fell within the safe harbor of Bankruptcy Code § 559;

---

[9] On December 7, 2007, HomeBanc filed an answer to the Interpleader Complaint which included affirmative defenses and crossclaims against Bear Stearns (Adv. D.I. 16). On the same date, Bear Stearns also filed an answer to the Interpleader Complaint, which included affirmative defenses and two crossclaims against HomeBanc. (Adv. D.I. 15).

After the Trustee was appointed, the Trustee filed a motion for leave to amend crossclaims (Adv. D.I. 88), which was granted by Order dated December 18, 2009 (Adv. D.I. 126). The Trustee filed his answer and amended crossclaims (Adv. D.I. 129), and Bear Stearns filed an answer and affirmative defenses to the amended crossclaims (Adv. D.I. 134).

[10] *Wells Fargo Bankr N.A. v. HomeBanc Corp. (In re HomeBanc Mortg. Corp.)*, 2013 WL 21180 (Bankr. D. Del. Jan. 18, 2013) (*"HomeBanc I"*) aff'd, in part, and rev'd, in part, *Miller v. Bear Stearns & Co., Inc. (In re HomeBanc Mortg. Corp.)*, 2014 WL 1268677 (D. Del. Mar. 27, 2014).

(2)    the plain language of the controlling contracts, as well as previous decisions in this Circuit, provided that the August Payment should be paid to the registered certificate holder of the Interpleader Securities as of the record date, *i.e.,* HomeBanc.; and

(3)    Bear Stearns' liquidation of the securities by auction in August 2007 was not irrational or in bad faith, and was permitted under the applicable repurchase agreement.

The Trustee appealed and, on March 27, 2014, the District Court issued a Memorandum Opinion affirming, in part, and reversing, in part, *HomeBanc I.*[11]  The District Court reversed the grant of summary judgment on the issue of whether the auction complied with the underlying contract, deciding (in part) that the Trustee's expert report (which had not been considered), together with the fact that the winning bid was submitted by Bear Stearns' trading desk, created factual issues about Bear Stearns' good faith.[12]  On remand, a six-day trial was held to consider the issue of Bear Stearns' good faith in connection with the sale of the securities by auction.

For the reasons that follow, I conclude that it was neither irrational nor bad faith for Bear Stearns to liquidate the repurchase agreement collateral by an auction in August 2007.  After examining the evidence surrounding the auction process and the market conditions at the time, I conclude that Bear Stearns' auction was completed in accordance with industry standards. Because the process was fair and customary, it also was not bad faith for Bear Stearns to accept the auction results as providing the fair market value of the securities.

## FACTS

Prior to its bankruptcy filing, HomeBanc was in the business of originating, securitizing and servicing residential mortgage loans.[13]  During the last several years of its existence,

---

[11] *Miller v. Bear Stearns & Co., Inc. (In re HomeBanc Mortg. Corp.),* 2014 WL 1268677 (D. Del. Mar. 27, 2014) ("*HomeBanc II*").

[12] *HomeBanc II,* 2014 WL 1268677 at *5-*6.

[13] Stipulation of Undisputed Facts, ¶ 1.

HomeBanc originated billions of dollars of residential mortgages, many of which were

"securitized," *i.e.,* transferred to securitization trusts which issued securities that were sold to

institutional and other investors.[14]  HomeBanc routinely retained mortgage-backed securities

from various securitizations, including the so-called subordinate tranches and residual interests

that were created as part of the securitization process.[15]

In 2005, HomeBanc entered into two repurchase agreements with Bear Stearns:

(1)     the master Repurchase Agreement dated as of September 19, 2005 between
        HomeBanc and BSC (the "MRA"); and

(2)     the TBMA/ISMA Global Master Repurchase Agreement dated as of October 4,
        2005 between HomeBanc and BSIL (the "GMRA").[16]

Between October 2005 and August 2007 HomeBanc obtained financing from Bear Stearns

through numerous repurchase transactions under the MRA and GMRA.[17]

The HomeBanc Default

On August 7, 2007, the terms of the repo transactions between HomeBanc and Bear

Stearns expired.[18]  On that date, Bear Stearns purchased outright from HomeBanc thirteen

securities that had been part of the repurchase transactions at the price of approximately

$121 million.[19]  The remaining securities included three mortgage-backed securities that were

---

[14]  Stipulation of Undisputed Facts, ¶ 2.

[15]  Stipulation of Undisputed Facts, ¶ 3.

[16]  Stipulation of Undisputed Facts, ¶ 4.  Joint Trial Exhibits 1 and 2.

[17]  "A repurchase agreement, or repo, is a transaction whereby one party transfers a security to another in exchange for funds along with a simultaneous agreement by the transferee to give back the security upon repayment of the funds." *HomeBanc II,* 2014 WL 1268677, *1, n.1. *See also* Bankruptcy Code § 101(47).

[18]  Connell Tr. at 32:15 - 33:1.  Brian Connell testified as a designated representative of the Bear Stearns defendants in depositions with the Trustee for the matters in dispute. Connell Tr. 21:9 - 21:21. Connell worked for ten years on Bear Stearns' fixed income finance desk (also called the repo desk) during the time in question. Connell Tr. 22:12 - 22:24. The page numbers for the transcripts for the entire six-day trial are numbered continuously and consecutively, rather than starting each day at page 1.  Reference to the transcripts will refer to the witness, followed by the page and line number.

[19]  Connell Tr. 30:13 - 32:14.

subject to repurchase agreements between HomeBanc and BSC pursuant to the MRA, and 34

mortgage-backed securities that were subject to repurchase agreements between HomeBanc and

BSIL pursuant to the GMRA (the "Remaining Securities"). Among the Remaining Securities

were the nine securities at issue in this litigation (the "Securities at Issue"), which had been

transferred by HomeBanc to BSIL pursuant to the terms of the GMRA:[20]

> HBMT 2004-1, Class R
>
> HBMT 2004-2, Class R
>
> HBMT 2005-1, Class R
>
> HBMT 2005-2, Class R
>
> HBMT 2005-3, Class R
>
> HBMT 2005-4, Class B-2
>
> HBMT 2005-4, Class R
>
> HBMT 2006-2, Class R
>
> HBMT 2007-1, Class R

Eight of the nine Securities at Issue were residual interests in HomeBanc securitizations

(excluding HBMT 2005-4, Class B-2) that were neither rated by rating agencies, nor traded on

any exchange.[21]

---

[20] Stipulation of Undisputed Facts, ¶ 9.
[21] Stipulation of Undisputed Facts, ¶17. At trial, Bear Stearns' expert witness described a "residual" security to the Court as follows:

> [T]he way residual mortgage-backed securities trusts work is . . . [thinking] of them almost like a little company. The asset side of the balance sheet consists of mortgage loans that are owned by the trust, and the liability side of the balance sheet consists of senior bonds and subordinated bonds that are issued by the trust.
> And then whatever's left over is the residual tranche. So, . . . many people have described it like the equity, in that the equity is the owner of the residual cash flow in a regular company.

Attari Tr. 890:8 - 890:20.

Upon expiration, HomeBanc was obligated to repurchase the 37 Remaining Securities at an aggregate price of approximately $64 million.[22] Bear Stearns offered to roll (or extend) HomeBanc's due date for repurchase of the Remaining Securities at a price of approximately $27 million.[23] Bear Stearns also offered to buy 36 of the Remaining Securities outright at a purchase price of approximately $60.5 million.[24] HomeBanc rejected Bear Stearns' offer to buy the Remaining Securities.[25] By the close of business on August 7, 2007, HomeBanc neither repurchased the Remaining Securities for approximately $64 million (as required by the MRA and the GMRA), nor paid $27 million to roll the due date for the Remaining Securities.[26]

By email dated Wednesday, August 8, 2007, at 5:58 pm, Bear Stearns sent a default notice to HomeBanc which read:

> We are hereby notifying you that all repurchase Transactions that Bear, Stearns & Co. Inc. and Bear, Stearns International Limited currently have with HomeBanc Corp. under the terms of the above-referenced agreements will not be "rolled", repriced or otherwise extended in any way, and as a result all such Transactions terminate on the scheduled Repurchase Date for such Transactions which is today, Wednesday, August 8, 2007. Under the terms of the MRA and the GMRA, all aggregate Repurchase Prices for all such Transactions, and all other related amounts owing by HomeBanc Corp. to Bear, Stearns & Co. Inc. and Bear, Stearns International Limited, are due and payable in full by HomeBanc Corp. by the close of business today.
>
> Notwithstanding the foregoing, and without in any way waiving any of its rights or remedies under the MRA or the GMRA or otherwise, Bear, Stearns & Co. Inc. and

---

[22] Connell Tr. 33:23 - 34:4.

[23] Connell Tr. 33:1 - 33:19. The Trustee's amended crossclaims describe the August 7, 2007 $27 million demand as a "Margin Call" under the MRA or a request for a "Margin Transfer" under the GMRA. *See* Adv. D.I. 129, ¶ 98 - ¶ 107.

[24] Connell Tr. 34:20 - 35:21. Bear Stearns' offer to purchase 36 of the Remaining Securities also included an offer to purchase servicing rights in connection with certain securities for another $30 million. HomeBanc rejected the entire offer. Connell Tr. 35:15 - 35:20. *See also* Chasin Tr. 1033:11 - 1036:15; Joint Trial Ex. 4. Matthew Chasin worked at Bear Stearns from 1994 until 2008. Chasin Tr. 1015:14 - 1015:21. Chasin started as an associate on the repo desk and was promoted to more senior roles, specifically on the mortgage and credit financing side. Chasin Tr. 1016:1 - 1016:12. In August 2007, he was a senior managing director with overall management responsibility for the mortgage and repo trading area. Chasin Tr. 1016:13 - 1017:19.

[25] Connell Tr. 34:20 - 35:21.

[26] Connell Tr. 34:11 - 34:19.

Case 07-51740-KJC    Doc 383    Filed 05/31/17    Page 9 of 41

Bear Stearns International Limited have at the present time decided to give HomeBanc Corp. until the close of business tomorrow, Thursday, August 9, 2007, to make all such payments in full to Bear, Stearns & Co. Inc. and Bear, Stearns International Limited.[27]

HomeBanc still failed to make any payment to repurchase the Remaining Securities.[28] On August 9, 2007 at 7:07 p.m., Bear Stearns sent formal default notices by email to HomeBanc.[29]   HomeBanc and various related entities filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code on the same day.[30]

As a result of HomeBanc's default, Bear Stearns took the position that it owned the Remaining Securities outright.[31] Management at Bear Stearns decided to auction the Remaining Securities to determine the fair market value of those securities.[32]

By emails sent between the morning of August 10, 2007 and August 14, 2007, Bear Stearns announced its intention to conduct an auction of the Remaining Securities (including the Securities at Issue) on August 14, 2007 (the "August 14 Auction").[33]   The emails (the "Bid Solicitations") advised that Bear Stearns was conducting an auction of two groups of assets (one group owned by BSC and one group owned by BSIL) and attached a bid list for each group of assets that listed each security, including each individual security's unique CUSIP identifier, the original face amount of the security, and the current factor for each security.[34]   The Bid

---

[27] Joint Trial Ex. 3.  Connell Tr. 36:4 - 36:9.
[28] Connell Tr. 204:18 - 204:24.
[29] Joint Trial Ex. 5 and Ex. 6.
[30] The chapter 11 case was converted to chapter 7 in February 2009.
[31] Connell Tr. 36:24 - 37:19.
[32] Connell Tr. 211:16 - 212:4; Chasin Tr. 1039:22 - 1041:22.
[33] Stipulation of Undisputed Facts, ¶ 10.
[34] Joint Trial Ex. 7.

Solicitations also noted that certain securities were subject to transfer restrictions and could only be purchased by a Real Estate Investment Trust, or REIT.[35]

Bear Stearns' sales force sent the Bid Solicitations to approximately 200 different entities and, at some entities, multiple individuals within the entity were solicited.[36] The Bid Solicitations, however, were not sent to HomeBanc, and HomeBanc was not provided with advance notice of the August 14 Auction.[37]

On August 14, 2007, Bear Stearns' mortgage trading desk submitted an "all or none" bid of $60.5 million for 36 of the Remaining Securities (including all of the Securities at Issue).[38] Tricadia Capital, LLC submitted the only other bid in the August 14 Auction, which was a bid totaling $2,187,290 for two securities.[39]

On August 15, 2007, the prior day's lump-sum bid from the trading desk for the Remaining Securities was allocated on a security-by-security basis.[40] Bear Stearns allocated a value of $900,000 for each of the nine Securities at Issue, thereby crediting an aggregate value of $8.1 million from the total auction amount to those securities.[41] Bear Stearns and its affiliates

---

[35] The restrictions were not imposed by Bear Stearns, but were characteristics of the securities themselves and the result of particular aspects of HomeBanc's securitization of the loans underlying the securities. Chasin Tr. 1066:16 - 1067:19; Bockian Tr. 786:22 - 788:8. Bear Stearns proffered Jeffrey Bockian, a manager of the repo desk at Countrywide Securities, as an expert witness with respect to customary and industry practice related to repo transactions and related auctions of residential mortgage-backed securities in connection with termination of repo agreements. Tr. 763:18 - 764:6. The Trustee did not object to Mr. Bockian's designation as an expert witness. *Id.*

[36] Connell Tr. 75:7 - 75:14; 230:14 - 235:14; Bear Stearns Ex. 60-A.

[37] Stipulation of Undisputed Facts, ¶ 12.

[38] Stipulation of Undisputed Facts, ¶ 15. Joint Trial Ex. 13. One of the 37 Remaining Securities was removed from the August 14 Auction because HomeBanc and JPMorgan had agreed to a transaction in which JPMorgan would purchase the security for $1 million. Joint Ex. 4. The JPMorgan transaction was not consummated and the security was offered in a subsequent Bear Stearns auction. Bear Stearns' trading desk submitted a bid of $1,256,000 for the security. Joint Trial Ex. 18; Connell Tr. 270:11 - 272:5.

[39] Joint Trial Ex. 12; Chasin Tr. 1126:10 - 1126:12. Mr. Connell testified that you had to multiply the price on Tricadia's fax by the factor and face amount to arrive at the total bid price. Connell Tr. 261:9 - 262:18.

[40] Stipulation of Undisputed Facts, ¶ 16.

[41] Joint Trial Exs. 15, 19.

retained possession and record title of the Securities at Issue, and have received and retained the

post-August 14 Auction cash flow distributed in connection with the Securities at Issue.[42]

## JURISDICTION

Congress granted jurisdiction over bankruptcy cases to the district courts in 28 U.S.C.

§ 1334, and then provided that "[e]ach district court may provide that any or all cases under

title 11 and any or all proceedings arising under title 11 or arising in or related to a case under

title 11 shall be referred to the bankruptcy judges for the district."[43] In 28 U.S.C. § 157(b)(1),

Congress limited the Bankruptcy Court's authority to enter final judgment to core proceedings.

> Congress gave bankruptcy courts the power to "hear and determine" core
> proceedings and to "enter appropriate orders and judgments," subject to appellate
> review by the district court. § 157(b)(1); see § 158. But it gave bankruptcy courts
> more limited authority in non-core proceedings: They may "hear and determine"
> such proceedings and "enter appropriate orders and judgments," only "with consent
> of all the parties to the proceeding." §157(c)(2). Absent consent, bankruptcy courts
> in non-core proceedings may only "submit proposed findings of fact and
> conclusions of law," which the district courts review *de novo*. § 157(c)(1).[44]

In *Stern v. Marshall,* however, the United States Supreme Court determined that "Congress

violated Article III of the Constitution by authorizing bankruptcy judges to decide certain claims

for which litigants are constitutionally entitled to an Article III adjudication."[45] Thus, a

bankruptcy court cannot enter final judgment on a "*Stern* claim," that is, "a claim designated for

final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in

that way as a constitutional matter."[46] The Supreme Court later decided that Article III permits

---

[42] Stipulation of Undisputed Facts, ¶ 18.
[43] 28 U.S.C. § 157(a).
[44] *Wellness Int'l Network, Ltd. v. Sharif,* ___ U.S. ___, 135 S. Ct. 1932, 1939, 191 L.Ed. 2d 911
(2015).
[45] *Id.* citing *Stern v. Marshall,* 564 U.S. 462, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011). *See also
Executive Benefits Inc. Agency v. Arkison,* ___ U.S. ___, 134 S .Ct. 2165, 189 L.Ed. 2d 83 (2014).
[46] *Executive Benefits,* 134 S. Ct. at 2170.

bankruptcy courts to enter final judgment in *Stern* claims submitted to them by consent of the parties.[47]

This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. While some of the Trustee's claims are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(E), (F) and (O), other claims by the Trustee, as well as cross-claims by Bear Stearns, are non-core, related-to claims for breach of contract, conversion and unjust enrichment.[48] It is undisputed that the parties consented to entry of a final order by this Court when this adversary proceeding started.[49] The Supreme Court has since confirmed that, due to the parties' consent, I have authority to enter final judgment on all of the claims before me.[50]

## DISCUSSION

The Trustee filed amended cross-claims against Bear Stearns alleging, in part, that Bear Stearns disposed of the Securities at Issue through an auction that did not comply with the terms of the GMRA because it was not conducted in good faith or in a commercially reasonable manner. In *HomeBanc I,* I examined the language of the GMRA and determined that, after HomeBanc defaulted, the GMRA granted Bear Stearns discretion in choosing a rational manner to determine the Net Value of the Remaining Securities (including the Securities at Issue).[51] The GMRA defined Net Value as:

> the amount which, in the reasonable opinion of the non-Defaulting Party, represents [the Remaining Securities'] fair market value, having regard to such pricing sources and methods . . . as the non-Defaulting Party considers appropriate, less, . . . all

---

[47] *Wellness Int'l,* 135 S. Ct. at 1949.

[48] "[R]elated to" jurisdiction applies when "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC),* 2017 WL 1032992, *2 (D. Del. Mar. 17, 2017) citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984).

[49] *See* Tr. 4/29/2014 at 12:15 - 12:19 (Adv. D.I. 321).

[50] *Wellness Int'l,* 135 S. Ct. at 1949.

[51] *HomeBanc I,* 2013 WL 211180 at *14 - *16.

Transaction costs which would be incurred in connection with the . . . sale of such Securities."[52]

The Trustee appealed *HomeBanc I* to the District Court, which agreed that the language of the GMRA granted Bear Stearns discretion to determine Net Value, and also agreed that the word "reasonable" modifying Bear Stearns' discretion added a "rationality" requirement, obligating Bear Stearns to act in good faith.[53]

However, the District Court did not agree that it was appropriate to grant summary judgment on the issue of whether Bear Stearns' auction complied with the GMRA, deciding that the Trustee's expert report explained why he thought the Bear Stearns' auction suffered from a number of serious flaws, raising a factual issue about Bear Stearns' good faith.[54] The District Court affirmed *HomeBanc I*, except with regard to the issue of whether the auction complied with the GMRA.[55] The trial on remand focused on this issue, which will be explored in three parts: (i) whether Bear Stearns' decision to determine the Net Value of the Securities at Issue by auction in August 2007 was rational or in good faith; (ii) whether the auction process utilized by Bear Stearns was in accordance with industry standards; and (iii) whether Bear Stearns' acceptance of the value obtained through the auction was rational or in good faith.

---

[52] *HomeBanc I*, 2013 WL 211180 at *15 citing GMRA, § 10(d)(iv). In short, calculating the Net Value allows the parties to set off or net the Net Value of the Remaining Securities against the amount HomeBanc owed Bear Stearns to determine whether Bear Stearns held a deficiency claim against HomeBanc or, alternatively, whether Bear Stearns owed monies to HomeBanc if the value of the Remaining Securities exceeded the HomeBanc claim.

[53] *HomeBanc II*, 2014 WL 1268677 at *5.

[54] *Id.* at *6.

[55] *Id.* Also, as discussed *infra.*, the District Court partially affirmed, and partially rejected, my conclusion that the Securities at Issue were "Repurchase Agreements" as defined in Bankruptcy Code § 101(47)(A).

1.    Was it a good faith/rational decision of Bear Stearns to determine fair market value of the Securities at Issue by an auction in August 2007?

The Trustee argues that Bear Stearns' decision to value the Remaining Securities through a "buyer-less auction in a dysfunctional market" was irrational, arbitrary, in bad faith and a breach of the GMRA.  The Trustee asserts two propositions:  (i) that there is no market for residual securities such as the Securities at Issue and, therefore, the only reasonable way to value such assets is by using a model such as the discounted cash flow model (the "DCF Model); and (ii) even if there is a market for residuals, the timing of Bear Stearns' auction was irrational and in bad faith because the market in August 2007 was dysfunctional.

(a)    Bear Stearns' use of an auction to value the Securities at Issue

The Trustee claims that there is no organized market for the Remaining Securities, especially with respect to the Securities at Issue which, he argues, were "bottom of the stack" residuals and were not liquid.  An expert witness for the Trustee, Dr. Steven V. Mann, opined that, as securities get less liquid and more complicated, models, such as the DCF Model, should be used to determine value, especially for residential mortgage-backed securities which have value because they are cash-flow producing assets.[56]  In July 2010, the Trustee's expert issued a report valuing the Securities at Issue at $124.6 million by using a DCF Model that calculated the present value of the projected cash flow from August 2007 to maturity.[57]  For reasons explained more fully *infra*, Bear Stearns criticized many of the assumptions underlying the Trustee's expert report, including a failure to consider significant events and similar market transactions occurring in and around August 2007.  Of course, to the extent assumptions in a model are wrong, the model may prescribe a value that is too low or too high.

---

[56] Mann Tr. 450:13 - 455:21.  Dr. Steven V. Mann was admitted, without objection, as an expert witness on fixed income securities.  Mann Tr. 438:22 - 439:8.

[57] HomeBanc Ex. 67.

Bear Stearns agrees that a discounted cash flow model would have been one way to determine the value of the Securities at Issue.[58]  However, an alternative valuation method, perhaps the most obvious one, is to enter the marketplace and see what someone is willing to pay for the securities.[59]  Repo participants often rely on the markets to value securities.  As discussed by Bear Stearns' expert, Mr. Bockian:

> [W]hat I would view to be market value for any security, not necessarily just the securities at issue, is what buyers and sellers will really transact in the marketplace.
>
> For a repo trader, that's the benchmark.  It doesn't matter if a security is worth 60 and I think it's going to 80.  I don't finance it based on 80.  I finance it based on 60.
>
> A cash trader might buy it for 60 because he thinks it's going to 80, but for repo market participants, the game is about providing financing at the current market value of a security which we generally look at as . . . where would that bond transact in the marketplace, particularly . . . where could I liquidate the bond if, heaven forbid, I had to.[60]

After HomeBanc's default, a group of senior managers at Bear Stearns met with their counsel to determine the most appropriate way to address the situation.[61]  The situation was not unique for Bear Stearns because, just prior to HomeBanc's default, another client - - American Home Mortgage - - defaulted on its repurchase financing transaction and Bear Stearns also used an auction to sell securities that were similar to the Remaining Securities, including residuals like the Securities at Issue.[62]  Bear Stearns executives decided that the best measure of value, especially in a turbulent, volatile market, was to seek prospective bidders for securities.[63]

---

[58] Connell Tr. 46:21 - 48:10.

[59] *Id.*

[60] Bockian Tr. 881:23 - 882:17.

[61] Chasin Tr. 1028:11-1028:24; 1039:22 - 1040:18; 1106:15 - 1109:13.

[62] Chasin Tr. 1048:24 - 1052:2. Connell Tr. 215:13 - 216:19; 253:20 - 254:13.  Like the HomeBanc auction, the Bear Stearns repo desk sold some residual securities from the American Home Mortgage auction to the Bear Stearns trading desk.  Chasin Tr. 1149:6 - 1149:15.

[63] Connell Tr. 215:9- 215:12.

The Trustee's expert agreed that these securities were traded in an "over-the-counter market" and that prices could be obtained by a dealer.[64] Bear Stearns demonstrated that residential mortgage-backed securities, including residuals like the Securities at Issue, were sold through an auction method known as "BWIC" or "bids wanted in competition," which is a "commonly used . . . auction technique to gain interest and actually buy and sell securities among institutional buyers and sellers."[65] The deposition testimony of several witnesses who were active in the market in August 2007 confirmed that, in and around 2007, it was common in the industry for a seller of residual mortgage-backed securities to solicit buyers on a daily basis through email announcements of BWICs.[66]

Mr. Connell testified that Bear Stearns used an auction, rather than a model, to determine the fair market price of the securities because "models don't buy bonds," and

> [A] model . . . has a bunch of assumptions baked in, and that might not reflect what the true market value is. For us . . . the paramount way to decipher true market value is what . . . someone else [is] going to pay for it.[67]

Mr. Chasin explained that Bear Stearns chose the BWIC method to get a fair market price because the process was:

---

[64] Q:   Are there any recognized markets or exchanges for the trading of residuals?
   A:   If by "market" you mean organized exchange, no, there is not. There is an over-the-counter market in which these securities trade, which is the connection . . . between computers and telephones between various dealers throughout the world.

   . . . .
   Q:   Is there any place to go to get a price quote for a security like that?
   A:   You would have to call a dealer and there's no magic board as to those prices, those buy-and-sell interests.
Mann Tr. 449:2 - 450:12. Mr. Connell also testified that the securities were not traded on an organized exchange, but were traded over-the-counter "through voice brokers . . . via telephone, via fax machine, by email." Connell Tr. 77:2 - 77:23.

[65] Bockian Tr. 771:8 - 771:17; 810:6 - 811:15.

[66] Andrews Dep. 89:22 - 92:10; Ha Dep. 41:8 - 43:8; Herr Dep. 19:5 - 22:3, 52:10 -53:13; Makhija Dep. 20:3 - 21:10, 45:24 - 46:19; Torres Dep. 15:19 - 19:10. The deposition designations were docketed at Adv. D.I. 380.

[67] Connell Tr. 213:21 - 214:7.

> similar to the process that Bear or similar financial institutions would do if they were selling similar portfolios of securities. . . . We went to other financial institutions to try to see if they had a larger or different network of potential buyers, all to try to create as many potential bidders as we could, and that was something which we believed was in the best interest of trying to get fair market value.[68]

Mr. Chasin also explained that Bear Stearns did not want to use computer generated values for the securities because:

> sometimes the matrix price, different pricing methods, we had would be very good proxies, but sometimes they weren't. Markets could get distressed, different situations could happen and the market price that we needed to have were actually prices where somebody would bid the securities.[69]

The Trustee claims that the DCF Model is the "gold standard" for valuing securities. While there are a number of ways to value the securities,[70] the issue before me is not which is the *ideal* valuation method, but, rather, whether Bear Stearns' decision to use a BWIC auction to value the Securities at Issue was irrational or in bad faith. Based upon the evidence before me, I conclude that residential mortgage-backed securities - - even residuals, like the Securities at Issue - - were often sold through BWICs and, therefore, Bear Stearns' decision, made contemporaneously with the HomeBanc default, to value the securities by determining what someone in the market was willing to pay for the Securities at Issue was not irrational or in bad faith.

(b)     The timing of Bear Stearns' auction

Alternatively, the Trustee contends that even if it is reasonable to value securities through a BWIC, the *timing* of Bear Stearns' decision was irrational and in bad faith because the market was clearly "dysfunctional" in August 2007. The Trustee relies on the *American Home*

---

[68] Chasin Tr. 1041:3 - 1041:22.
[69] Chasin Tr. 1042:3 - 1042:14.
[70] Connell Tr. 47:10 - 53:4.

*Mortgage* decisions,[71] in which the Court of Appeals for the Third Circuit analyzed language in Bankruptcy Code § 562 and determined that a discounted cash flow analysis was an acceptable type of "commercially reasonable determinants of value" for calculating a damage claim under Bankruptcy Code § 562.[72]

In *American Home Mortgage,* the debtors and the bank were parties to a repurchase agreement.[73] After the debtors defaulted, the bank exercised its acceleration rights under the repurchase agreement on August 1, 2007, triggering the debtors' obligation to repurchase the mortgage loans held by the bank.[74] The debtors filed chapter 11 bankruptcy petitions on August 6, 2007 and the bank commenced litigation seeking a declaratory judgment (and the Court so held) that the repurchase agreement fell within the definition of a "repurchase agreement" under Bankruptcy Code § 101(47) and that the bank's rights "were not stayed, avoided, or otherwise limited with respect to ownership of the Loan Portfolio."[75]

Later, the bank filed a claim for damages under § 562, and the debtors objected to the bank's claim, commencing the litigation that brought the issue before the Bankruptcy Court. The bank argued that the only appropriate valuation methodology for measuring damages is the price obtained by selling the loans on the market and, on August 1, 2007 (the date of acceleration), the bank could not obtain a commercially reasonable price because "the market was distressed and the Loan Portfolio suffered from a number of deficiencies."[76] The bank argued that the earliest date on which there existed a commercially reasonable determinant of value was over a year later

---

[71] *In re Am. Home Mortg. Holdings, Inc.,* 411 B.R. 181 (Bankr. D. Del. 2009) (*AMH I*"), *aff'd but criticized* 637 F.3d 246 (3d Cir. 2011) ("*AMH II*"). This case is also sometimes referred to as *"Calyon."*
[72] *AMH II,* 637 F.3d at 255-58.
[73] *AMH I,* 411 B.R. at 184.
[74] *Id.*
[75] *Id.* at 185.
[76] *Id.* at 186.

on August 15, 2008.[77] The debtors argued in response that at least two different methodologies were available on the acceleration date to determine commercially reasonable values for the Loan Portfolio - - a discounted cash flow analysis and a market analysis obtained by the bank outside the context of litigation.[78]

The Bankruptcy Court held that the bank did not meet its burden of demonstrating that "no commercially reasonable determinants of value" existed on the acceleration date because the debtors' discounted cash flow analysis is a commercially reasonable methodology for determining the value of the Loan Portfolio.[79] On appeal, the Court of Appeals agreed that the discounted cash flow analysis was a commercially reasonable determinant of value for measuring damages under Bankruptcy Code § 562.[80] The Third Circuit noted that "if Congress had intended § 562 to be limited to market or sale price, it would have said so. It did so in § 559."[81] Judge Rendell also noted in her concurring opinion to *AHM II* that the language of Bankruptcy Code § 562 clearly uses the plural, referring to "commercially reasonable *determinants* of value," so that sale price should not be viewed as the exclusive method for determining value.[82] Under the same reasoning, a DCF Model also is not the exclusive method for determining value.

In *HomeBanc I*, I determined that the *American Home Mortgage* decision did not apply here because Bear Stearns acted under § 559, and was not seeking a damage claim under § 562.

---

[77] *Id.*

[78] *Id.*

[79] *Id.* at 198.

[80] *AMH II*, 637 F.3d at 258-59.

[81] *AMH II*, 637 F.3d at 258.

[82] *AMH II*, 637 F.3d at 259. Judge Rendell also noted that the bank in *American Home Mortgage* retained the loans and received the cash flow and, therefore, using a DCF would appear to be the most reasonable determinant of value. *Id.* Here, Bear Stearns sold the collateral through an auction proceeding, the result of which transferred ownership to the Bear Stearns trading desk. Although Bear Stearns ultimately owned the Remaining Securities, it did so only after following a sale process.

The Trustee argues, however, that Bankruptcy Code § 562 now applies based on the District Court's decision in *HomeBanc II.*  There, the District Court rejected my conclusion in *HomeBanc I* that the Securities at Issue fell within the Bankruptcy Code's definition of "repurchase agreement" pursuant to § 101(47)(A)(i), but agreed with my alternative conclusion and decided that the disputed securities qualified as repurchase agreements under § 101(47)(A)'s catchall provision:

> It seems to me that the only possible reading of this provision is that it is designed to encompass some sorts of transactions that do not fall neatly within the first four subsections.  There is no doubt that the disputed transactions were part and parcel of their undisputed repo transactions.  It therefore seems to me that the extra securities were plainly within the umbrella of "credit enhancements."  I conclude the disputed securities were repo agreements within the meaning of § 101(47)(A)(v).[83]

Bankruptcy Code § 101(47)(A)(v) provides:

> The term "repurchase agreement" (which definition also applies to a reverse repurchase agreement) - -
>    (A)    means - -
> . . . .
>       (v)    any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii) or (iv) . . . , *but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562 of this title* . . . .[84]

Bankruptcy Code § 562 provides in pertinent part:

> (a)    If the trustee rejects a . . . repurchase agreement . . . or if a . . . repo participant . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of - -
>       (1)    the date of such rejection; or
>       (2)    the date or dates of such liquidation, termination, or acceleration.
> (b)    If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall

---

[83] *HomeBanc II,* 2014 WL 1268677 at *4.
[84] 11 U.S.C. § 101(47)(A)(v) (emphasis added).

be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.[85]

The Trustee argues that, because Bankruptcy Code § 562 applies, the *American Home Mortgage* decisions also apply. In *AMH II,* the Court of Appeals agreed with the Bankruptcy Court's determination that:

> [T]he market price should be used to determine an asset's value when the market is functioning properly. It is only when the market is dysfunctional and the market price does not reflect an asset's worth should one turn to other determinants of value.[86]

While there are similarities between the matter before me and *American Home Mortgage* (*i.e.,* a default under a repurchase agreement in August 2007), there are also striking differences that weigh against the use of a DCF Model here. In *American Home Mortgage*, the parties all *agreed* that the market for mortgage loans (not mortgage-backed securities) was dysfunctional in August 2007. Here, the issue of whether the market for residential mortgage-backed securities was dysfunctional - - and what exactly that means - - is a matter of an energetic dispute.[87] Further, the bank in *American Home Mortgage* did not try to sell the mortgage loans after the default and acceleration in August 2007, but, instead, held the collateral. Bear Stearns also remained in possession of the Remaining Securities after default, but it did so only after it held a BWIC auction. Accordingly, I must examine the Trustee's claim that an auction should not have been used as a "commercially reasonable determinant of value."

The Trustee points to comments of many witnesses about the distressed state of the markets, but particularly relies on the deposition testimony of a Bear Stearns' mortgage trader

---

[85] 11 U.S.C. §562.

[86] *AMH II,* 637 F.3d at 257.

[87] The burden of proof standard of Bankruptcy Code § 562(c) applies when damages are not measured as of the liquidation, termination or acceleration date and one party objects to using a different date. Here, both parties use the liquidation date, but argue whether an auction or the DCF Model is a better commercially reasonable determinant of value.

stating that the market for residential mortgage-backed securities in August 2007 was "very dysfunctional," and having "little to no liquidity."[88] The Trustee's expert agreed, noting that "market dysfunction" was "not a term in economics," but he defined it as:

> low liquidity and . . . chaos in the market such that the normal price discovery process is not functioning properly. During those episodes, prices can be detached from their true fundamental values and diverge considerably."[89]

In contrast, Bear Stearns asserts that the complete testimony of witnesses who were active in the residential mortgage-backed securities market in August 2007 shows that the market was volatile and market prices were declining, *but* the market was functioning and transactions were occurring.[90] Mr. Chasin testified:

> Yes, it was a bad market. Market prices were failing . . . It doesn't mean that the market wasn't functioning. We know that in times of stress, you have asset prices which fall. It happens in markets all over the place. And sometimes markets crash. And there are bad markets and there's bad days, but that doesn't mean things don't trade. . . . So from our perspective, we knew it was a bad market, but we were still there making bids for clients like we did for Homebanc.[91]

Further, Mr. Bockian, who managed the repo desk at Countrywide Securities at the time, described the market as follows:

> [D]uring the period of time in question, which is this August 2007 time frame, we were observing market participants, . . . both buyers and sellers, . . . hedge funds, REITs, Wall Street companies, insurance companies, all kinds of professional pricers of mortgage-backed securities, which were contingent on . . . the anticipated expected cash flows of the securities, were being marked down precipitously, not just HomeBanc deals.
>
> [T]he market as a whole had [a] . . . come-to-Jesus moment about . . . everything we've built, all these securitizations, all these many, many hundreds of billions of

---

[88] Adv. D.I. 380, Van Lingen Dep. 10:10 - 12:06.

[89] Mann Tr. 469:18 - 470:7.

[90] Chasin Tr. 1044:10 - 1047:7; Connell Tr. 164:18 - 164:21 ("I don't think the market was dysfunctional. I think the market was repriced."); Adv. D.I. 380 Torres 49:22 - 50:13 ("There was a market for mortgage-backed securities in the summer of 2007. . . . In my opinion, it got more volatile from the beginning of the year toward the end of the year and continued so into '08. Certain products were less liquid than others.").

[91] Chasin Tr. 1129:1 - 1129:18.

dollars of outstanding securities which had relatively thin margins between elevated default rates and other poor characteristics in terms of how the loans performed, that that margin was, in retrospect, thin and looked like it might get thinner.[92]

Mr. Bockian also recalled that:

[D]uring July and August and September of 2007, what I saw was a market that was certainly depressed, particularly from a pricing and liquidity point of view, but that in my observation was functioning. There were bonds being traded. I was able to present bonds to my cash traders. They were able to price it for repo purposes. Being an observer on the floor and sitting close to some of these desks there were trades being done.

So I certainly would not deny that that was a very rough period and that was a distressed period in the market. You know, I think the way I viewed it [was] that somewhere in August of 2007 the market reached a tipping point and a lot of stress did come in and prices deteriorated.

But I saw trades taking place, and that's - - that's where it is a little difficult to - - for me to call the market dysfunctional.[93]

Moreover, there was no evidence of other factors that might be considered indicia of market dysfunction: asymmetrical information between buyers and sellers, inadequate information in general (transparency of recent transactional prices), market panic (as in the market immediately after the Lehman Brothers September 15, 2008 bankruptcy filing), high transaction costs, the absence of any creditworthy market participants or fraud.

The facts adduced here show a repo counter-party acting in real time and in accordance with industry standards to liquidate securities in a volatile market. The Trustee faults the Bear Stearns repo desk for considering that "time was of the essence" in disposing of the Remaining Securities in August 2007, rather than holding them.[94] But Bear Stearns sought to determine fair

---

[92] Bockian Tr. 878:22 - 879:22.

[93] Bockian Tr. 850:21 - 852:4.

[94] Mr. Connell explained: "We were not in that business. We were financiers. We were not in the business of taking principal risk against the residual and subordinate mortgage-backed securities. . . . [O]ur function is to finance clients, to lend money and then . . . get paid back. To the extent we end up with securities, we wanted to . . . eliminate exposure as quickly as possible and get paid back and settle up and move on." Connell Tr. 214:8 - 214:20.

market value at the time of default, rather than at an indeterminate point in the future, especially due to its view that time *was* of the essence, given that there was no indication in August 2007 when or if market prices would stabilize, and every indication that the market might continue to decline. Mr. Bockian testified:

> [I]n August 2007 it, candidly, felt like things weren't going to get better. It was really becoming hard to view housing prices which were starting to accelerate in terms of depreciation and the knock-on effects to the underlying mortgages as defaults rose.
>
> It was very hard to see how, the period we're in, the moment we're in in August 2007 was going to be a natural stopping point for that activity. It felt much more like we're at the beginning of the cascade, we're at the beginning of the waterfall and still had time to travel. And I think, in fact, that was borne out by continued downward pressure on home prices, continued knock-on effects in the underlining loans' performance and then the creation of government programs that not only were designed to help homeowners stay in their homes and bring some stability to the underlying mortgages, but then . . . the wholesale bailout of the banking sector because of its exposure to mortgage-backed securities.[95]

Parties trading at the time could see that the market was unsettled, but trades were occurring. People were making decisions in real time and had no guarantee about when or if prices would bounce back or continue to decline. After HomeBanc's default, Bear Stearns proceeded to liquidate the Remaining Securities as permitted by the terms of the GMRA and as allowed by the Bankruptcy Code. Bear Stearns chose to auction the Remaining Securities to discover what a willing buyer would pay for the Remaining Securities in the marketplace. The Bear Stearns trading desk submitted a bid in accordance with the bid procedures. Viewing the facts and circumstances in this case in light of the events as they were unfolding in August 2007 shows that this auction was a commercially reasonable determinant of value for Bear Stearns.

I conclude that Bear Stearns' decision to determine the value of the Securities at Issues by an auction in August 2007 was not irrational or in bad faith.

---

[95] Bockian Tr. 874:20 - 875:20.

2.    Was the auction process utilized by Bear Stearns in accordance with industry standards?

The Trustee posits that the auction process utilized by Bear Stearns was deficient and designed in a way to discourage bidding. Bear Stearns replies that the auction process was a "thoughtful, good faith attempt to generate outside bidding for the HomeBanc Securities, and in every respect complied with or exceeded industry custom."[96]

The Trustee's expert, Mr. Scott Calahan of Boston Portfolio Advisors, pointed out what he thought were various flaws in the process that he perceived would prevent other parties from bidding on the Securities at Issue.[97] First, Mr. Calahan claimed that the Bid Solicitation did not provide potential bidders with sufficient information to formulate a bid.[98] I disagree.

The Bid Solicitations listed the 37 Remaining Securities subject to auction, including security description, each individual security's unique CUSIP identifier, the original face amount of the security, and the current factor for each security.[99] The Bid Solicitation also advised potential bidders that if they wanted more information (*i.e.*, remittance reports and loan tapes), they could contact Lisa Marks, an officer in Bear Stearns' FAST Group, who was familiar with the Remaining Securities and what was needed to price them.[100] It was not practical for Bear Stearns to attach other documents and data related to the Remaining Securities (such as remittance reports or prospectus supplements) to the Bid Solicitation because doing so would significantly increase the size of the email, which would prevent it from reaching its intended

---

[96] Adv. D.I. 379, Bear Stearns' Post-Trial Brief at 13.
[97] Scott Calahan was offered as an expert witness on the valuation and sale of mortgage-backed securities and, in particular, residuals. Tr. 586:16 - 591:15; 595:14- 595:18. Bear Stearns' objection to qualifying Mr. Calahan as an expert on the *sale* of such collateral was overruled; although I noted that weight of Mr. Calahan's testimony would be affected by the type of his sales experience. Tr. 597:11 - 607:18.
[98] HomeBanc Ex. 67 at 21.
[99] Joint Ex. 7.
[100] Joint Ex. 7. Chasin Tr. 1058:22 - 1059:11.

recipients.[101]  However, data needed to prepare a bid for securities with cash flows was available on third-party analytic software that was ubiquitous in the finance industry, such as Bloomberg or Intex.[102]

Several industry witnesses agreed that the information in the Bid Solicitation allowed potential bidders to access documentation and other information necessary to evaluate the Remaining Securities, including the Securities at Issue, for the purpose of formulating a bid.[103] The process and information needed to evaluate the residual Securities at Issue is no different from the process and information needed to evaluate the more senior tranche Remaining Securities.[104]  The weight of the evidence demonstrated that the Bid Solicitation contained sufficient information for potential bidders to evaluate whether to submit a bid and to formulate a bid.

Second, Mr. Calahan claimed the Bid Solicitation did not provide adequate time for responses, since potential bidders had only three business days or less to submit irrevocable bids on complicated securities that required considerably longer to evaluate.[105]  Here, potential bidders were provided two and one-half business days, as well as two full weekend days, to

---

[101]Chasin Tr. 1059:12 - 1060:11; Adv. D.I. 380 Hoffman Dep. 55:25 - 56:20.

[102] Attari Tr. 900:14 - 903:4; Chasin Tr. 1059:12 - 1060:17; Adv. D.I. 380 Andrews Dep. 42:6 - 42:25; Hoffman Dep. 50:1 - 50:11.

[103] Bockian Tr. 789:10 - 793:14 (Q: [L]ooking at this page in its entirety, the descriptions of the securities, the information provided, in your view, sir, was there anything missing from this list that is customarily provided? A: No. This is complete.); Adv. D.I. 380 Herr Dep. 22:12 - 22:22 (Q: If you received an email bid solicitation for the sale of mortgage-backed securities, what information would you need to evaluate whether Credit Suisse is interested in purchasing that security?  A: A lot - - I mean, pretty much the information that's listed on this bid solicitation is, you know, pretty much market standard.  You give the security name, the CUSIP, the original face, which is the amount they're looking for a bid on.  And the factor, obviously, is helpful."); *see also* Andrews Dep. 41:17 - 42:25; Torres Dep. 21:19 - 22:2, 25:14 - 26:16; 60:10- 61:22).

[104]Attari Tr. 899:16 - 900:13; Chasin Tr. 1062:2 - 1062:15. *See also* Calahan Tr. 612:22 - 615:10 (describing the information needed to value residual securities and agreeing that information for public deals like the Securities at Issue was available from the third-party programs, such as Bloomberg, or from the seller).

[105] HomeBanc Ex. 67 at 21. Calahan Tr. 625:12 - 627:10.

assess their interest and formulate a bid.[106]  Several witnesses testified that this amount of time

was more than what was typically provided to buyers of residential mortgage-backed securities

in a BWIC process, and was more than enough time for sophisticated participants in the market

to evaluate and price securities for the purpose of bidding in an auction.[107]

Based on their experience in the industry and in consultation with counsel, senior

managers at Bear Stearns indicated that the auction timeline would balance the need to provide

adequate time for potential bidders to formulate a bid, but protect against the risk of further

market decline.[108]  Mr. Chasin explained:

> [W]e were trying to strike a balance.  We were trying to think about what was . . .
> enough time for investors to take this information which we were ready to give
> them relative to the risk of the market continuing to fall. . . [O]n Tuesday the client
> had failed to pay us the pare-off amount when the trade was rolled.  . . . [W]e didn't
> default them until Thursday.  We sent the bid out Friday to conduct an auction the
> following Tuesday.  That to us felt like, you know, a lot of time for the market,
> where the market was certainly not getting any better.[109]

The record demonstrates that the BWIC provided potential bidders with adequate time in

accordance with industry standards to formulate a bid.

Next, Mr. Calahan claimed that the manner in which the Bid Solicitation was distributed

failed to target buyers in an appropriate fashion because the email "blast" was likely to be

---

[106] Joint Ex. 7.

[107] Adv. D.I. 380 Andrews Dep. 49:21 - 50:12; Ha Dep. 43:9 - 43:24; Torres Dep. 28:25 - 29:16;
Makhija Dep. 25:21 - 27:10; Bockian Tr. 780:13 - 781:16; Attari Tr. 900:18 - 901:16. *See also* Mann
Tr. 511:3 - 511:9 ("Q:  And you agree, sir, don't you, that Wall Street investment banks and asset
management firms have models that are readily available to them to project cash flows and determine values
of residual interests in mortgage-backed securities?  A: That's true.")

[108] Connell Tr. 236:22 - 238:12.  *See also* Bockian Tr. 777:6 - 777:21 ("You know, it's very
important to allow sufficient time for the bidders to evaluate their interest and price the collateral in the
event they have interest in participating.  At the same time, it's very important to not allow excess time,
particularly in August 2007, given that market conditions were, you know, certainly deteriorating by the
week and at times were deteriorating by the day.  So that you'd want to allow sufficient time, but you
wouldn't want to allow more than sufficient time.")

[109] Chasin Tr. 1056:11 - 1057:16.

ignored as spam.[110]  In response, Bear Stearns submitted testimony of Mr. Bockian who worked

in the market in August 2007 and explained that distribution of the BWIC lists for the Remaining

Securities was:

> in keeping with industry standard methods in terms of how salespeople generally
> communicate with customers.  So while it's certainly - I mean, I can understand on
> some level the use of the word "spam" because you're sending it to a lot of different
> entities, but that is the nature of the business.  If you're a salesperson, and certainly
> a sales team as large as Bear Stearns' sales team, you would send out e-mails to
> many recipients all at once. . . . [T]his was the best way to do it.[111]

The Bid Solicitation was sent to at least 197 different entities via email and/or the Bloomberg

messaging system.[112]  The Bid Solicitation was sent to a wide variety of institutions that were

active in the marketplace for residential mortgage-backed securities, including over 40 that were

(or could transact on behalf of) a real estate investment trust (or REIT).[113]

Among the recipients of the Bid Solicitation were other broker dealers at Deutsche Bank,

Royal Bank of Scotland and UBS, who were competitors of Bear Stearns and could utilize their

sales forces to distribute widely the Bid Solicitations.[114]  Bear also utilized its own sales force to

send the bid solicitation emails to its own clients because:

> We wanted . . . to go through our sales force to reach out to all the investors
> because this was the most efficient way to do it.  Our salespeople were the
> best people to talk to about the assets.  They knew exactly who to go to with
> their clients.  If the clients received an email from them, they would know
> that it was most likely related to buying or selling the mortgage securities.[115]

---

[110] HomeBanc Ex. 67 at 19.

[111] Bockian Tr. 776:9 - 777:5.  Adv. D.I. 380 Hoffman Dep. 63:4 - 64:3; Herr Dep. 18:24 - 19:15l; 30:4 - 31:5.

[112] Joint Ex. 14; Connell Tr. 225:4 - 226:5; Bear Stearns Ex. 60(A); Connell Tr. 230:14 - 235:14.

[113] Bear Stearns Ex. 60(A); Bockian 802:1 - 803:23.

[114] Connell Tr. 218:19 - 220:10; Chasin Tr. 1052:3 - 1053:3; Joint Ex. 7.

[115] Chasin Tr. 1068:5 - 1068:14.  *See also* Connell Tr. 220:11 - 223:11; Bear Stearns Ex. 19.

Moreover, the sales force was rewarded based on "the amount of transactions . . . [and] the amount of sales" they completed, "so they were incentivized to go out and do so."[116] Mr. Bockian testified that it is industry custom for a large broker-dealer like Bear Stearns to capitalize on the experience and contacts of its sales force, which often interacts with its customers daily and knows its customers' areas of focus and interest.[117] Further, it was appropriate for Bear Stearns to solicit other broker/dealers who may have customer networks unknown to Bear Stearns and which would increase the likelihood of getting bids.[118] After the auction, Bear asked the sales force to compile a list of the people and entities who received the Bid Solicitation.[119] Bear Stearns' evidence supports the conclusion that it distributed the Bid Solicitations widely and in accordance with industry standard.

Mr. Calahan also opined that the auction was deficient because its unreasonable rules required outside bidders to submit irrevocable bids, while Bear Stearns was permitted to remove securities, extend the bidding deadline and/or cancel the auction.[120] Bear Stearns countered that many of the items criticized by Mr. Calahan were procedural safeguards included in the BWIC to protect the integrity of the auction and encourage bidding. The Bid Solicitation provided that bids were irrevocable for a three-hour period after the 3:00 p.m. bid submission deadline.[121] Bear Stearns explained that the irrevocability period provides Bear Stearns with adequate time to assess any competing bids, resolve any questions, and determine the winning bids on a security-by-security basis.[122] The purpose of the provision allowing Bear Stearns to withdraw any

---

[116] Connell Tr. 222:12 - 223:11.
[117] Bockian Tr. 803:24 - 804:19.
[118] Bockian Tr. 804:20 - 806:2.
[119] Connell Tr. 223:12 - 223:21; 225:4 - 225:24; Chasin Tr. 1068:19 - 1070:8; Joint Ex. 14.
[120] HomeBanc Ex. 67 at 20.
[121] Joint Ex. 7.
[122] Connell Tr. 238:14 - 239:4.

securities from the auction or extend the bidding deadline is to ensure that Bear Stearns would not have to accept any unreasonably low bids that did not reflect fair market value.[123] None of these provisions were unusual or would prevent bidders from bidding.[124]

The Bid Solicitation also provided that an affiliate of Bear Stearns reserved the right to submit a bid 30 minutes prior to the bidding deadline for non-Bear Stearns affiliated bidders.[125] Mr. Bockian testified that it was not uncommon for broker/dealers to reserve the right to bid at their own auction.[126] The purpose of requiring early submission for an affiliate's bid was to communicate to potential bidders that any Bear Stearns affiliate could not access other bids and use that information to top the highest bid as of the close of the auction.[127] The Bid Solicitation also required bids to be submitted to an attorney in Bear Stearns' legal department, whose office was located in a different building from the repo desk and the trading desk.[128] This "wall" was not typical in BWIC auctions, but was a prudent and helpful measure to limit the information that would be available to the trading desk in preparing its bid.[129]

It is inescapably obvious that review of this auction sale from one Bear Stearns desk to another calls for particularly close scrutiny, but the evidence before me shows that there was nothing unusual about the Bid Solicitation procedures and nothing to indicate that the procedures were designed to - - or did - - discourage bidding on the Remaining Securities. Instead of "favoring the house," the procedures protected bidders by preventing a Bear Stearns affiliate

---

[123] Connell Tr. 242:16 - 243:11; Chasin Tr. 1058:9 - 1058:21.
[124] Bockian Tr. 794:23 - 796:2 (a three-hour irrevocable period is very common), 796:3 - 797:4 (ability to withdraw securities from bidding or extend the bidding deadline is common). *See also* Adv. D.I. 380 Herr Dep. 37:5 - 37:15; Makhija Dep. 39:8 - 40:8.
[125] Joint Ex. 7.
[126] Bockian Tr. 797:19 - 798:19.
[127] Chasin Tr. 1064:15 - 1065:6
[128] Joint Ex. 7; Connell Tr. 249:29 - 251:16.
[129] Bockian Tr. 798:20 - 800:18.

from gaining an advantage in formulating its bid. I find no merit in Mr. Calahan's criticisms of

the process used by Bear Stearns to conduct the BWIC auction. Fuss as he may, the Trustee was

unable to offer credible evidence of any untoward conduct by Bear Stearns in either its decision

to conduct an auction or in the conduct of the auction itself. Accordingly, there is nothing in the

record to support a conclusion that Bear Stearns conducted the auction in an irrational manner or

without good faith.[130]

    3.    <u>Was it a good faith/rational decision of Bear Stearns to accept the outcome of the auction as the fair market value of the Securities at Issue?</u>

On August 14, 2007, prior to the deadline in the Bid Solicitation, the Bear Stearns trading

desk submitted an "all-or-none" bid of $60.5 million for 36 of the 37 Remaining Securities,

including all of the Securities at Issue.[131] Tricadia Capital, LLC submitted the only other bid for

two securities for a total bid of $2,187,290.[132]

One of the Remaining Securities had been withdrawn from the August 14, 2007 auction

because Bear Stearns understood that HomeBanc had arranged to sell the withdrawn security to

JP Morgan.[133] Since Bear Stearns owned the security, it solicited JP Morgan for a separate

auction on the security held on August 17, 2007.[134] JP Morgan did not submit a bid, and the

---

[130] The Trustee relies upon *Gatz Properties v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012) as a comparable case in which the court awarded damages to minority members after insiders purchased their interests in the limited liability company at an auction in which no competing bids were received. That case is distinguishable on a number of levels and has no relevance here. In particular, the court determined that the auction was a "sham," that was not marketed or advertised properly and conducted on onerous terms. The court wrote, "[b]y failing for years to cause [the company] to explore its market alternatives, [the insider] manufactured a situation of distress to allow himself to purchase [the company] at a fire sale price at a distress sale." *Id.* at 1215 quoting *Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 875 (Del. Ch. 2012). Here, I have determined that Bear Stearns' auction procedures were usual and fair.

[131] Stipulation of Undisputed Facts, ¶15. Joint Trial Ex. 13. Connell Tr. 54:10 - 55:13; 262:19 - 265:12.

[132] The two securities were HMBT 2004-1 2B ($1,786,470) and HMBT 2004-1 1B ($400,820). Joint Trial Ex. 12. Connell Tr. 261:6 - 262:18.

[133] Connell Tr. 265:13 - 267:1; 270:11 - 271:8.

[134] Joint Trial Ex. 16. Connell Tr. 270:11 - 271:8.

security was sold to the Bear Stearns trading desk for a bid of $1.265 million - - more than HomeBanc had believed JP Morgan was willing to pay for the security.[135]

As the highest bidder, the Bear Stearns trading desk purchased the 37 Remaining Securities, including the Securities at Issue, for a total bid of $61,756,000.[136] After the August 14 Auction was completed, Bear Stearns allocated the auction proceeds across the individual securities for purposes of Bear Stearns' intra-company accounts.[137] Bear Stearns allocated value of $900,000 to each of the nine Securities at Issue, for a total of $8.1 million.[138]

The Trustee argues that even if the auction process was fair and in accordance with industry standards, Bear Stearns could not rationally or in good faith accept that the bid received from the Bear Stearns trading desk represented the fair market value of the Remaining Securities, or, in particular, the Securities at Issue. The Trustee claims that his experts' discounted cash flow analysis shows that the Securities at Issue had a fair market value in August 2007 of approximately $124.6 million, rather than Bear Stearns' assigned value of $8.1 million. Bear Stearns argues in response that the assumptions and hindsight analysis included in the Trustee's DCF Model inflated the value of the Securities at Issue to an unrealistic figure, considering the market volatility in August 2007.

The Trustee maintains that a model, such as the DCF Model, should be used to value mortgage-backed securities which have value because they are cash-flow producing assets.[139] A DCF Model for this type of security makes assumptions about matters affecting the underlying mortgages' cash flows, such as prepayments, default risks, delinquency rates and loss severity

---

[135] Joint Trial Ex. 18.  Connell Tr. 271:9 - 272:5.
[136] Joint Trial Ex. 19.  Connell Tr. 272:6 - 272:19.
[137] Stipulation of Undisputed Facts, ¶16.   Joint Trial Ex. 15, 19.  Connell Tr. 267:2 - 268:12.
[138] Joint Trial Ex. 15, 19.
[139] Mann Tr. 450:13 - 455:21.

rates.[140]  Other assumptions reflecting the time value of money and the risks for these securities

determine the rate used to discount the cash flow generated by the mortgages over time back to

present value.[141]

The Trustee's three experts prepared and reviewed the DCF Model to value the Securities

at Issue.  Mr. Calahan constructed the original DCF Model "and then Dr. DeRosa's staff . . . took

the model apart piece by piece . . . [and] replicated the model that Mr. Calahan did the heavy

lifting on."[142]  Drs. Mann and DeRosa said that they tested the reasonableness of the valuation

assumption and suggested changes when appropriate.[143]  The experts claimed to use only

historical information that would have been available to someone in August 2007.[144]  Once the

team was satisfied with the assumptions and the discount rate, the DCF Model was used to

project the cash flow for the Securities at Issue, which were then discounted to present value.[145]

Based on the DCF Model, the Trustee's team of experts opined that the aggregate value of the

Securities at Issue as of August 2007 was $124.6 million.[146]

Bear Stearns criticized the Trustee's DCF Model because it did not consider the

significant market events occurring in and around August 2007, including bankruptcy filings of

HomeBanc and American Home Mortgage.  The Trustee, however, claims that any market

dysfunction occurring in August 2007 did not impact the value of the Securities at Issue because,

as stated by his expert Mr. Calahan:

> [T]he value of the residuals is based on expected cash flows, and expected cash
> flows are driven  by mortgage loan performance by individual borrowers mailing

---

[140] Mann Tr. 452:23 - 454:4.

[141] *Id.*

[142] Mann Tr. 457:6 - 457:10.

[143] Mann Tr. 456:15 - 457:15

[144] Mann Tr. 457:16 - 458:8. HomeBanc Trial Exhibit 77.

[145] Mann Tr. 457:16 - 465:19.

[146] Mann Tr. 467:21 - 468:4.  HomeBanc Trial Ex. 78 allocated the total $124.6 million value among the individual Securities at Issue.

in their checks to the servicer, and they were . . . light years apart from the trouble that was going on in New York and London.[147]

The Trustee's expert, Dr. Mann, also testified that the bankruptcy remote structure of the securities prevented the bankruptcy of the issuer, HomeBanc, from having any negative impact on the value of those securities, explaining:

> The whole structure of securities do not depend in any way on the credit risk of the original issuer . . . . The sheer act of bankruptcy wouldn't have any impact on the securities' value.  So American Home Mortgage goes bankrupt, HomeBanc goes bankrupt, the securities depend on assets in the special purpose vehicle and not on HomeBanc or American Home Mortgage.[148]

On its own, the issuer's bankruptcy may not have had a significant impact on the securities' value, but the market turmoil was not limited to HomeBanc's troubles. Dr. Attari, Bear Stearns' expert witness on the valuation of residential mortgage-backed securities, testified that a DCF Model must be "anchored" to "some market price or some form of price at which people are either trading or willing to trade."[149]  DCF Models, like other valuation models, are, after all, only artificial constructs, or proxies, for market value.  Bear Stearns asserts that the bankruptcy filings of HomeBanc and American Home Mortgage, together with stagnant or falling real estate values and other volatility in the market, necessarily would affect the assumptions in the Trustee's DCF Model about delinquencies, default rates and loss severity rates which, in turn, would decrease the cash flows for mortgages underlying the securities.[150] I agree.

---

[147] Calahan Tr. 619:13 - 614:14.

[148] Mann Tr. 479:21 - 480:21.

[149] Attari Tr. 898:9 - 898:18. Bear Stearns proffered, without objection, Dr. Mukkarram Attari as an expert witness on the valuation of residential mortgage-backed securities.  Tr. 892:12 - 892:19.

[150] Attari Tr. 923:8 - 932:22.  Dr. Attari opined, for example, that the mortgage lenders' bankruptcies limited the availability of credit and prevented borrowers from being able to refinance their mortgages on better terms, leading to possible defaults.  *Id.* at 927:22 - 928:10.

The Trustee also argues that his DCF Model was a better predictor of the actual cash flow of the Securities at Issue. Bear Stearns assigned a value of only $8.1 million for the Securities at Issue as a result of the auction, but the Trustee asserts that the Securities at Issues' actual post-petition cash flow between August 9, 2007 and May 31, 2014 reached approximately $89.2 million.[151]

Dr. Mann testified that he and the other experts did not use the actual cash flow information available in 2010, but relied on information that would have been available in August 2007.[152] Bear Stearns maintains, however, that the cash flow in the Trustee's DCF Model aligned closely with the *actual* cash flow through July 2010, and after that date, the projected cash flow varied significantly from the actual cash flows:

- For the period August 2007 - May 2010 - the DCF Model predicted cash flows of $90 million, and the actual cash flows were $76 million.

- For the period June 2010 - September 2014, the DCF Model predicted cash flows of $76.2 million, and the actual cash flows were $13.2 million.

- For the period October 2014 onward, the DCF Model predicted cash flows of $99.7 million, while actual cash flows for the Securities at Issue ended before July 2012.[153]

The Trustee's DCF Model predicted that future cash flow from the Securities at Issue would exceed $265 million. Although the actual cash flow reached $89.2 million as of May 31, 2014, the parties agreed that the securities were unlikely to have any additional cash flow after that date.[154] The DCF Model's predicted cash flows are largely overstated.

Bear Stearns also argues that the Trustee's DCF Model fails to account for or consider contemporaneous mark-to-market valuations of the Securities at Issue that were calculated by

---

[151] HomeBanc Trial Ex. 106; HomeBanc Trial Ex. 132; Calahan Tr. 647:8 - 649:9.
[152] Mann Tr. 541:2 - 544:23.
[153] Mann Tr. 540:14 - 555:9.
[154] *Id.*

both Bear Stearns and HomeBanc in the time period preceding HomeBanc's default and the subsequent auction.[155] The Trustee's experts admitted that they did not adjust the DCF Model to account for prices from transactions between market participants that took place on or about the August 2007.[156]  Bear Stearns contends that the critical valuation metric for repo securities was the daily market value. The parties agree that the repo business is a daily mark-to-market business, meaning that the parties will calculate the value of the collateral subject to the repo on a daily basis based on current market conditions "to make margin calls if the collateral value has gone down or to pay back margin if the market value has gone up."[157] The parties also agree that either could make a margin call on the other if it believed that, owing to market conditions or otherwise, the market value of the securities underlying the repurchase transactions had increased or decreased such that more or less repo funding was appropriate.[158]

Consequently, the Bear Stearns repo desk reviewed the market value for each security subject to the repurchase transactions, including the HomeBanc securities, in its daily Exposure Reports.[159]  A look at the Bear Stearns Exposure Reports' valuations at the end of July and beginning of August 2007 shows the following:[160]

---

[155] Calahan Tr. 709:7 - 710:1. The United States Commodity Futures Trading Commission's Glossary defines Mark-to-Market as:
> Part of the daily cash flow system used by U.S. futures exchanges to maintain a minimum level of margin equity for a given futures or option contract position by calculating the gain or loss in each contract position resulting from changes in the price of the futures or option contracts at the end of each trading session. These amounts are added or subtracted to each account balance.

http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#M, last accessed May 8, 2017.

[156] Mann Tr. 529:16 - 530:11. Calahan Tr. 717:9 - 721:21.

[157] Connell Tr. 167:13 - 167:23; Kubiak Tr. 360:3 - 361:14.

[158] Chasin Tr. 1021:9 - 1023:12; *See generally* Joint Trial Ex. 1 at 9 - 11 (§4).

[159] HomeBanc Trial Ex. 119; Chasin Tr. 1074:11 - 1074:24 ("The exposure reports were reports which we looked at on a daily basis which showed us what the market value was of the securities which we were leaning against . . . . [W]e would make decisions as to making margin calls or not.");

[160] Bear Stearns Ex. 78

|  | Exposure Report 7/27/2007 | Exposure Report 8/3/2007 | Exposure Report 8/6/2007 |
|---|---|---|---|
| Securities at Issue | $ 20,960,348.00 | $ 20,044,216.00 | $ 12,674,495.00 |
| All Remaining Securities | $120,171,126.00 | $118,936,450.00 | $ 67,710,026.00 |

The Trustee points to the "disappearance" of $51.2 million of value in the Remaining Securities in one business day (8/3/2007 was a Friday; 8/6/2007 was a Monday) as evidence of bad faith by Bear Stearns. He asserts that Bear Stearns artificially reduced the value of the Remaining Securities in the Exposure Reports by $51.2 million, knowing that if HomeBanc defaulted on its obligation to repurchase the Remaining Securities on August 6, 2007 and Bear Stearns took possession of those Remaining Securities, then Bear Stearns would have to pay HomeBanc any amount in excess of the debt under the netting obligations in the GMRA.[161]

Bear Stearns counters that the significant decrease in the market value of the Remaining Securities between August 3, 2007 and the close of business on August 6, 2007 that was reflected on the Exposure Reports was due to events in the market, rather than any nefarious purpose. General market stress was causing prices to decrease sharply leading up to and during this time.[162] HomeBanc's competitor, American Home Mortgage, defaulted on its repurchase obligation to Bear Stearns shortly before August 3, 2007 and filed for bankruptcy protection on August 6, 2007.[163] Mr. Chasin testified that the default and bankruptcy of American Home Mortgage signaled to market participants that securities comparable to the Remaining Securities

---

[161] *See* Connell Tr. 124:2 - 125:23.
[162] Kubiak Tr. 374:21 - 375:12; Bockian Tr. 819:7 - 820:4, 876:6 - 881:11.
[163] Chasin Tr. 1141:19 - 1142:7; Connell Tr. 177:4 - 177:12 (stipulation that American Home Mortgage filed chapter 11 on August 6, 2007).

likely would be auctioned or otherwise sold into the marketplace, which would cause increased supply in a generally declining market and, consequently, further decrease prices.[164]

The Trustee also contends that Bear Stearns formed a real estate investment trust ("SMOREIT") on August 1, 2007 to facilitate its becoming the registered holder of repo collateral of HomeBanc. Bear Stearns explained credibly that, as the markets got choppy in the summer of 2007, it recognized the need to take various steps to manage the risk associated with the securities it was financing and ensure that it was prepared in the event of a default. Establishing a REIT was one aspect of "trying to get its ducks in a row" if it had to liquidate collateral.[165]

At the same time, HomeBanc also maintained an internal mark-to-market spreadsheet reflecting the market value prices obtained by Bear Stearns on the Remaining Securities so it could track how much Bear Stearns was willing to finance based on the securities.[166] On or about August 5, 2007, Mr. Kubiak (HomeBanc's Chief Investment Officer) prepared a spreadsheet of his "rough cut" estimate of what he expected someone in the market might bid on the Remaining Securities, including the Securities at Issue.[167] Mr. Kubiak testified that he believed the securities were worth more, but he was calculating what "the market would bid on those securities."[168] In his analysis on August 5, 2007, he estimated that the market would value the Securities at Issue at roughly $18.5 million.[169]

Bear Trial Exhibit 78 shows the gap between the contemporaneous exposure report valuations in the summer of 2007 and the valuations in the Trustee's DCF Model:

---

[164] Chasin Tr. 1084:3 - 1085:10.
[165] Chasin Tr. 1136:15 - 1141:18; Connell Tr. 188:6 - 189:12.
[166] Bear Stearns Ex. 8. Kubiak Tr. 364:8 - 371:2.
[167] Bear Stearns Ex. 10.
[168] Kubiak Tr. 389:4 - 393:13.
[169] Bear Stearns Ex. 10.  Kubiak Tr. 392:4 - 392:9.

| Series [Securities at Issue] | Bear Stearns' 7/27/07 exposure report | HomeBanc's 8/5/07 MBS/Repo Position Sheet | Bear Stearns' 8/6/07 exposure report | Auction Proceeds 8/14/07 | DCF Model Valuation |
|---|---|---|---|---|---|
| HMBT 2004-1 R | $ 436,675 | $1,457,666 | $1,000,000 | $ 900,000 | $ 3,282,803 |
| HMBT 2004-2 R | $2,500,000 | $1,710,319 | $1,000,000 | $ 900,000 | $ 10,087,833 |
| HMBT 2005-1 R | $1,500,000 | $1,744,506 | $1,000,000 | $ 900,000 | $ 22,421,435 |
| HMBT 2005-2 R | $1,000,000 | $ 566,531 | $1,000,000 | $ 900,000 | $ 4,056,449 |
| HMBT 2005-3 R | $1,500,000 | $1,762,478 | $1,500,000 | $ 900,000 | $ 24,734,083 |
| HMBT 2005-4 R | $2,750,000 | $2,309,071 | $2,750,000 | $ 900,000 | $ 34,630,664 |
| HMBT 2005-4 B2 | $3,123,673 | $2,649,519 | $ 924,495 | $ 840,450 | $ 2,977,801 |
| HMBT 2006-2 R | $6,750,000 | $4,315,181 | $2,500,000 | $ 900,000 | $ 22,369,508 |
| HMBT 2007-1 R | $1,400,000 | $2,053,142 | $1,000,000 | $ 900,000 | |
| **Total** | **$20,960,348** | **$18,568,413** | **$12,674,495** | **$ 8,040,450** | **$ 124,560,576** |

I agree with Bear Stearns that the Trustee's DCF Model value is far removed from what anyone in the market was willing to pay for the Securities at Issue in August 2007. Instead, the Trustee's DCF Model erroneously reflects the value of the Securities at Issue as of July 2010, when the expert report was issued, rather than a fair market value as of August 2007.

Bear Stearns maintains that it relied rationally on the market to value the Remaining Securities. After a thorough review of the language of the GMRA in *HomeBanc I*, I concluded that Bear Stearns had the contractual right to exercise discretion in choosing a rational manner in which the Net Value of the securities should be determined.[170] I concluded:

> Because the GMRA grants the non-Defaulting party (in this case, the Bear Defendants) contractual discretion with respect to post-default valuation of the securities, the circumstances in which this Court should intervene with the Bear Defendants' exercise of discretion to value the Securities at Issue are limited. This is especially true given the sophistication of the parties. The Bear Defendants' exercise of discretion must not be arbitrary or capricious, but made honestly and in good faith.[171]

---

[170] *HomeBanc I*, 2013 WL 211180 at *16.

[171] *Id.* The GMRA provides that it is to be "governed and construed in accordance with the laws of England" (Joint Ex. 1, § 17). Therefore, I relied upon English case law deciding that "[i]t is very well established that the circumstances in which a court will interfere with the exercise by a party to a contract of contractual discretion given to it by another party are extremely limited." *Id.* at *15 quoting *Socimer Int'l Bank Ltd. v. Standard Bank London Ltd.,* [2008] EWCA (Civ) 116 [¶ 62] (Court of Appeal) (Eng). The *Socimer* Court further noted, "This is the world of sophisticated investors, not that of consumer

Bear Stearns points to several independent factors to support the rationality and good faith of its valuation: (1) the bid reflects the fair market value of the Securities at Issue because the auction process was fair and in accordance with industry standards; (2) the bid reflected the contemporaneous estimates of value for the Securities at Issue as shown on the Bear Stearns Exposure Reports and the "rough cut estimate" of market value prepared by HomeBanc; (3) the Bear Stearns trading desk's individual bid for the last security auctioned on August 17, 2007 was actually higher than the price that HomeBanc thought JP Morgan had agreed to pay for it; and (4) HomeBanc, itself, did not and could not find another repo counterparty that would finance the repo collateral or outright purchase the securities for an amount great than the aggregate repurchase price, which was approximately $63.8 million at the time of the default.[172]

Bear Stearns' expert, Dr. Attari, opined that "[t]he results of a properly conducted auction give you the value of the security, give you the highest amount that someone is willing to pay for that security."[173]  When asked if the market could price a security inaccurately, he answered:

> After the fact, the people have pointed back and said our market was pricing securities incorrectly.  But rarely has it been possible in real time.  In fact, one of the things that the Fed has pointed out repeatedly is that it's almost impossible to identify bubbles, which is when security prices are too high in real time.  And, you know, because bubbles cause great harm to the economy after the fact, [o]ne of the things they like to be able to do is identify bubbles and make sure they don't occur, but it's almost impossible to identify them.[174]

Bear Stearns rationally accepted the highest bid by its trading desk as the value of the Securities at Issue in August 2007.

---

protection.  These merchants in the securities of emerging markets have made an agreement which speaks of the need for a spot valuation, not of the more leisurely process of taking reasonable precautions, such as properly exposing the mortgaged property for sale, designed to get the true market price by correct process." *Socimer,* at ¶ 22.

[172] Kubiak Tr. 354:24 - 358:18; *see also* Connell Tr. 183:3 - 185:1.

[173] Attari Tr. 903:9 - 903:12.

[174] Attari Tr. 903:16 - 904:4.

### Conclusion

Courts must (1) determine facts based solely on the record made at trial, (2) identify relevant legal principals, and (3) apply governing law. Therefore, based on the record before me and addressing the issue remanded by the District Court, I conclude that Bear Stearns acted rationally, in good faith, and in accordance with the GMRA when it determined the fair market price of the Remaining Securities, including Securities at Issue, by holding a BWIC auction in August 2007. The evidence showed that there was a difficult, but functioning, market for selling the Securities at Issue and that Bear Stearns' Bid Solicitations complied with all the usual and customary standards for holding a BWIC auction.

The parties will be directed to confer and submit a form of order addressing each of the Trustee's amended crossclaims and Bear Stearns' crossclaims consistent with this Opinion, *HomeBanc I,* and *HomeBanc II.*

An appropriate order follows.


BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: May 31, 2017